## STATE v. REINHARD C. HOLTHUSEN.

113 N. W. (2d) 180.

January 26, 1962—No. 38,348.

---

538

*Walter F. Mondale*, Attorney General, *Henry H. Feikema*, Special Assistant Attorney General, and *Herbert E. Olson*, County Attorney, for plaintiff.

*Whitney E. Tarutis*, for defendant.

THOMAS GALLAGHER, JUSTICE.

On December 14, 1960, the grand jury of Beltrami County returned an indictment for murder in the second degree against defendant, Reinhard C. Holthusen, a non-Indian resident within the boundaries of Red Lake Indian Reservation in Beltrami County, for the death of Palmer Anderson, a non-Indian killed within the reservation.

Defendant demurred to the indictment on the ground that, although Red Lake Indian Reservation is within the boundaries of Beltrami County, neither the grand jury nor the district court of such county had jurisdiction or authority with respect to the crime described in the indictment, in that the State of Minnesota is without authority with respect to criminal offenses committed by a non-Indian against a non-Indian within the exterior boundaries of such reservation. On December 21, 1960, the District Court of Beltrami County made its order overruling such demurrer but certifying that the jurisdictional question raised therein was important and doubtful so that the present appeal to this court might be taken.

In support of his contention defendant sets forth the following historical background of the Chippewa Indian Nation including the tribe now designated as the Red Lake Indians presently occupying the Red Lake Indian Reservation: Under the Northwest Ordinance, 1 Stat. 51, 52, enacted by the United States Congress on July 13, 1787, it is provided:

(Article III) "* * * The utmost good faith shall always be observed towards the Indians; * * * and in their * * * rights * * * they never shall be invaded or disturbed, * * *."

(Article IV) "* * * The * * * new States, shall never interfere with the primary disposal of the soil by the United States in Congress assembled, * * * ."

By treaty between the United States and the Chippewa Indian Nation dated January 9, 1789, it is provided:

## "ARTICLE IX

"If any person or persons, citizens or subjects of the United States, or any other person not being an Indian, shall presume to settle upon the land confirmed to the said nations, he and they shall be out of the protection of the United States; and the said nations may punish him or them in such manner as they see fit." 7 Stat. 28, 30; 2 Kappler, Indian Affairs, Laws and Treaties (2 ed.) 18, 21.

Under the Organic Act by the United States Congress dated March 3, 1849, 9 Stat. 403, 405, establishing the territorial government of Minnesota over lands which included Red Lake Indian Reservation it is provided that:

"* * * no law shall be passed interfering with the primary disposal of the soil; * * *."

Under the Enabling Act of the United States Congress dated February 26, 1857, authorizing the creation of the State of Minnesota, and providing that it be comprised of lands which included the Red Lake Indian Reservation, it is provided (11 Stat. 166, 167):

"* * * said State shall never interfere with the primary disposal of the soil within the same, by the United States, * * * ."

Based upon the described treaty, ordinance, and enactments, which at no time have been abrogated or repealed, and upon the fact that at no time did the Chippewa Indian Nation or any of its tribes cede to the United States or to Minnesota any of the territory now within the exterior limits of Red Lake Indian Reservation, claimed by the Chippewas under aboriginal occupancy, defendant contends that the

state has no basis for its claim of jurisdiction to hear or determine cases involving crimes committed by non-Indians against non-Indians within such reservation.

In opposition to defendant's argument, the state contends that under the Enabling Act of 1857, in which the United States made no reservations as to jurisdiction over lands within the Red Lake Indian Reservation, Minnesota acquired exclusive jurisdiction with respect to crimes committed by non-Indians against non-Indians on Indian lands within the limits of the state as then established, including the Red Lake Indian Reservation as now defined.

In certifying that the question involved was important and doubtful, the trial court stated:

"I know of no other reservation territory which has never been ceded by treaty to the United States of America. Congress cannot give * * * what the Government has never owned, * * *.

"Statehood is really rather immaterial to and not germane to our question here; * * * there is federal authority, with which counsel are familiar I am sure, that Reservations are generally Indian Territory and that the whites criminal acts against whites thereon is a violation of state law, that is the general proposition without actually facing up to the unceded situation of this territory, * * *."

■ We are of the opinion that the principles set forth in United States v. McBratney, 104 U. S. (14 Otto) 621, 623, 26 L. ed. 869, 870, govern here. There it was stated:

"* * * Whenever, upon the admission of a State into the Union, Congress has intended to except out of it an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words. The Kansas Indians, 5 Wall. 737 [72 U. S., XVIII., 667]; U. S. v. Ward, *supra*. The State of Colorado, by its admission into the Union by Congress, upon an equal footing with the original States in all respects whatever, without any such exception as had been made in the treaty with the Ute Indians and in the act establishing a territorial government, has acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute Reservation, and that reservation is

no longer within the sole and exclusive jurisdiction of the United States. The courts of the United States have, therefore, no jurisdiction to punish crimes within that reservation, unless so far as may be necessary to carry out such provisions of the treaty with the Ute Indians as remain in force. But that treaty contains no stipulation for the punishment of offences committed by white men against white men. It follows that the Circuit Court of the United States for the District of Colorado has no jurisdiction of this indictment, but, according to the practice heretofore adopted in like cases, should deliver up the prisoner to the authorities of the State of Colorado to be dealt with according to law. United States v. Cisna, 1 McLean, 254, 265; Coleman v. Tennessee, 97 U. S. 509, 519."

This rule has been recognized here. In State v. Campbell, 53 Minn. 354, 355, 55 N. W. 553, 554, 21 L. R. A. 169, with reference to the White Earth Reservation, it was expressed as follows:

"This reservation was not excepted from the general jurisdiction of the laws of the state by the act admitting the state into the Union, and our attention has not been called to any existing treaty between the United States and this tribe of Indians excepting this reservation from the jurisdiction of the state. And we take it as well settled that, when not restricted by treaty with the Indian tribe, or by the act admitting a state into the Union, the jurisdiction of the state extends over the territorial limits of an Indian reservation so as to apply to all persons therein not tribal Indians under the care of the United States."

In State v. Jackson, 218 Minn. 429, 432, 16 N. W. (2d) 752, 755,[1] it was stated:

"The admission of a state into the Union, even without an express reservation by congress of governmental jurisdiction over the public lands within its borders, does not qualify the former federal jurisdiction over tribal Indians so as to withdraw from the United States authority

---

[1]This case was decided prior to the enactment of 67 Stat. 588, 18 USCA, § 1162, which transferred, from the United States to the state, jurisdiction over offenses committed by or against Indians in Indian country within the state except offenses committed within the Red Lake Indian Reservation.

to punish crimes committed by or against Indians on an Indian reservation · * * * or so as to make tribal Indians amenable to state laws for crimes committed on their reservation."

As to Minnesota, neither the Enabling Act of February 26, 1857, authorizing the establishment of its state government, nor the enactment of May 11, 1858, 11 Stat. 285, admitting it to the Union, contained any reservation in the United States as to jurisdiction over lands comprising the Red Lake Indian Reservation, which were within the territorial limits of the state. Likewise, there is no mention therein of any treaty or agreement between the United States and the Chippewa Nation or any of its tribes whereby there was reserved to either of the latter jurisdiction over crimes committed by non-Indians against non-Indians within the limits of such reservation.

■ Defendant contends, however, that by virtue of the Northwest Ordinance and the treaty with the Chippewa Nation made January 9, 1789, there can be spelled out a treaty or agreement between the United States and the Chippewa Nation whereby there was reserved to the latter jurisdiction over crimes committed by non-Indians against non-Indians on lands confirmed to the Chippewas, binding upon the United States and in consequence upon Minnesota when it was admitted to the Union. With respect to the Northwest Ordinance, promulgated by the United States Congress July 13, 1787, the territory covered thereby did not include any of the area now comprising the Red Lake Indian Reservation,[2] and hence it would not have any application herein. As to the treaty of January 9, 1789, there is nothing therein which confirms to the Chippewa Nation or any of its tribes title to or jurisdiction over any part of the lands which presently comprise the Red Lake Indian Reservation, and which then

---

[2]The area covered by the terms of the Northwest Ordinance is defined therein as "the territory of the United States north-west of the river Ohio." 1 Stat. 51. This did not extend to any part of the area subsequently acquired from France through the Louisiana Purchase in 1803. 8 Stat. 200. The part of the territory covered by the Northwest Ordinance, which subsequently became part of Minnesota, does not include any portion of Red Lake Indian Reservation now constituted.

were actually not even within the territorial limits claimed by the United States. By its terms this treaty recognized the jurisdiction of the Chippewa Nation over crimes committed by non-Indians against non-Indians within an area defined therein which was adjacent to and south of Lake Erie and far east of the eastern boundary of Minnesota.[3]

■ Defendant asserts further that the principles set forth in United States v. McBratney, *supra*, have no application here where the lands comprising the Red Lake Indian Reservation were never ceded to the United States by the Chippewa Nation, or any of its tribes,[4] so as to give the United States the jurisdiction over this area which it presumed to transfer to Minnesota when the latter became a state. It is defendant's contention that, where Indian territory has not been ceded to the United States by formal act or treaty, sovereignty or jurisdiction over such territory must be held to remain in the Indian occupants

---

[3]The lands confirmed to the Chippewa Nation in the treaty of January 9, 1789, in which jurisdiction over non-Indians settled therein was reserved by Article IX to the Chippewa Nation, were described therein as follows (Article II): "* * * Beginning at the mouth of Cayahoga river, and running thence up the said river to the portage between that and the Tuscarawa branch of Muskingum, then down the said branch to the forks at the crossing-place above fort Lawrence, thence westerly to the portage on that branch of the Big Miami river which runs into the Ohio, * * * then along the said portage to the Great Miami or Omie river, and down the south-east side of the same to its mouth; thence along the southern shore of Lake Erie to the mouth of Cayahoga, where it began." 7 Stat. 28, 2 Kappler, Indian Affairs, Laws and Treaties (2 ed.) 18, 19.

[4]By treaty dated October 2, 1863, between the United States and the Chippewa Red Lake-Pembina Bands, the Chippewa Red Lake Indians who then occupied the area presently comprising Red Lake Indian Reservation, and substantial territory to the south and northwest thereof, ceded to the United States all such occupied territory with the exception of the lands presently within such reservation. 13 Stat. 667, 2 Kappler, Indian Affairs, Laws and Treaties (2 ed.) 853. By implication the lands not ceded were subsequently recognized by the United States as the Red Lake Indian Reservation and the tribal occupants thereof were treated by the United States in the same manner as were the tribal occupants of other reservations created after formal cession to the United States of the lands comprising the same.

thereof by virtue of aboriginal occupancy. This contention is in conflict with the historical concept of sovereignty over Indian lands adhered to by the United States and based upon conquest or exploration of such lands or their transfer to the United States from other nations claiming such sovereignty over them. Here the United States' sovereignty over the Red Lake Indian Reservation relates back to its purchase from France in 1803 of a large area west of the Mississippi River under a document historically designated as the Louisiana Purchase. Thereunder, all of the lands claimed by France west of the Mississippi, the northern boundaries of which were ultimately established by treaty with Great Britain in 1818[5] and which accordingly included the area now comprising the Red Lake Indian Reservation, were transferred from France to the United States.

This concept of sovereignty over Indian lands, based upon conquest, exploration, or purchase, has been given recognition by the United States Supreme Court and applied regardless of whether the Indian lands involved had been ceded to the United States or otherwise. Johnson and Graham's Lessee v. M'Intosh, 8 Wheat. 543, 5 L. ed. 681 (1823); Beecher v. Wetherby, 95 U. S. (5 Otto) 517, 24 L. ed. 440 (1877); Buttz v. N. P. Railroad, 119 U. S. 55, 7 S. Ct. 100, 30 L. ed. 330 (1886); Shoshone Tribe of Indians v. United States, 299 U. S. 476, 57 S. Ct. 244, 81 L. ed. 360 (1937); Northwestern Bands of Shoshone Indians v. United States, 324 U. S. 335, 65 S. Ct. 690, 89 L. ed. 985 (1945); Tee-Hit-Ton Indians v. United States, 348 U. S. 272, 75 S. Ct. 313, 99 L. ed. 314 (1955). The court's opinion in United States v. Tillamooks, 329 U. S. 40, 67 S. Ct. 167, 91 L. ed. 29 (1946), which seems somewhat in conflict with

---

[5] 8 Stat. 248. The northern boundaries of the territory included in the Louisiana Purchase were indefinite, apparently due to the belief that the Mississippi River had its source in Lake of the Woods. Conflicting claims with Great Britain over the northern boundary of the United States which arose later were settled by treaty with Great Britain in 1818 which established the northern boundary of the United States at the 49th parallel— to the north of the area now comprising the Red Lake Indian Reservation. Accordingly, the boundary lines of the territory purchased from France in the Louisiana Purchase would include such reservation.

the established concept as described was later clarified to conform therewith. See, Hynes v. Grimes Packing Co. 337 U. S. 86, 69 S. Ct. 968, 93 L. ed. 1231 (1949); United States v. Tillamooks, 341 U. S. 48, 71 S. Ct. 552, 95 L. ed. 738 (1951); Tee-Hit-Ton Indians v. United States, 348 U. S. 272, 282, 75 S. Ct. 313, 318, 99 L. ed. 314, 321 (1955).

In Tee-Hit-Ton Indians v. United States, *supra,* the principles upon which this concept of sovereignty over Indian lands is based are discussed at length. There the facts upon which Indian tribal claims were based were somewhat similar to those here in that there the lands in question (situated in Alaska) had also been acquired by the United States from a foreign nation (Russia) and in that there, as here, the tribal Indians claiming title to such lands based their claims in part upon their aboriginal occupancy thereof, together with the fact that they had never ceded or transferred title thereto to the United States or any other nation. Section 8 of the Organic Act of Alaska, there involved, provided (23 Stat. 24):

"* * * the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: * * *."

There, after an extended discussion[6] of the Indian claims and their historical background, the United States Supreme Court denied them, stating (348 U. S. 288, 75 S. Ct. 322, 99 L. ed. 325):

---

[6]Tee-Hit-Ton Indians v. United States, 348 U. S. 272, 277, 75 S. Ct. 313, 316, 99 L. ed. 314, 319: "* * * It is petitioner's contention that its tribal predecessors have continually claimed, occupied and used the land from time immemorial; that when Russia took Alaska, the Tlingits had a well-developed social order which included a concept of property ownership; that Russia while it possessed Alaska in no manner interfered with their claim to the land; that Congress has by subsequent acts confirmed and recognized petitioner's right to occupy the land permanently and therefore the sale of the timber off such lands constitutes a taking pro tanto of its asserted rights in the area.

"The line of cases adjudicating Indian rights on American soil leads to the conclusion that *Indian occupancy, not specifically recognized as ownership by action authorized by Congress, may be extinguished by the Government without compensation.* Every American schoolboy

---

"The Government denies that petitioner has any compensable interest. It asserts that the Tee-Hit-Tons' property interest, if any, is merely that of the right to the use of the land at the Government's will; that Congress has never recognized any legal interest of petitioner in the land and therefore without such recognition no compensation is due * * *.

"I. *Recognition.* — The question of recognition may be disposed of shortly. Where the Congress *by treaty or other agreement* has declared that thereafter Indians were to hold the lands permanently, compensation must be paid for subsequent taking. The petitioner contends that Congress has sufficiently 'recognized' its possessory rights in the land in question so as to make its interest compensable. Petitioner points specifically to two statutes to sustain this contention. The first is § 8 of the Organic Act for Alaska of May 17, 1884, 23 Stat. 24. The second is § 27 of the Act of June 6, 1900, which was to provide for a civil government for Alaska, 31 Stat. 321, 330. * * *

"We have carefully examined these statutes and the pertinent legislative history and find nothing to indicate any intention by Congress to grant to the Indians any permanent rights in the lands of Alaska occupied by them by permission of Congress. Rather, it clearly appears that what was intended was merely to retain the status quo until further congressional or judicial action was taken. There is no particular form for congressional recognition of Indian right of permanent occupancy. It may be established in a variety of ways *but there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation.* * * *

* * * * *

"II. *Indian Title.* — (a) The nature of aboriginal Indian interest in land and the various rights as between the Indians and the United States dependent on such interest are far from novel as concerns our Indian inhabitants. *It is well settled that in all the States of the Union the tribes who inhabited the lands of the States held claim to such lands after the coming of the white man, under what is sometimes termed original Indian title or permission from the whites to occupy.* That description means *mere possession* not specifically recognized as ownership by Congress. After conquest they were *permitted* to occupy portions of territory over which they had previously exercised 'sovereignty,' as we use that term. This is not a prop-

knows that the savage tribes of this continent were deprived of their ancestral ranges by force and that, even when the Indians ceded millions of acres by treaty in return for blankets, food and trinkets, *it was not a sale* but the conquerors' will *that deprived them of their land*." (Italics supplied.)

---

erty right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians.

"This position of the Indian has long been rationalized by the legal theory that *discovery and conquest gave the conquerors sovereignty over and ownership of the lands thus obtained.* 1 Wheaton's International Law, c. V. The great case of Johnson v. McIntosh, 8 Wheat. 543, denied the power of an Indian tribe to pass their right of occupancy to another. It confirmed the practice of two hundred years of American history 'that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest.' p. 587.

\* \* \* \* \*

"No case in this Court has ever held that taking of Indian title or use by Congress required compensation. The American people have compassion for the descendants of those Indians who were deprived of their homes and hunting grounds by the drive of civilization. They seek to have the Indians share the benefits of our society as citizens of this Nation. Generous provision has been willingly made to allow tribes to recover for wrongs, *as a matter of grace, not because of legal liability.*\* \* \*

\* \* \* \* \*

"\* \* \* What has been heretofore set out deals largely with the Indians of the Plains and east of the Mississippi. The Tee-Hit-Tons urge \* \* \* that their stage of civilization and their concept of ownership of property takes them out of the rule applicable to the Indians of the States. They assert that Russia never took their lands in the sense that European nations seized the rest of America. The Court of Claims, however, saw no distinction between their use of the land and that of the Indians of the Eastern United States. \* \* \* That court had no evidence that the Russian handling of the Indian land problem differed from ours. The natives were left the use of the great part of their vast hunting and fishing territory but what Russia wanted for its use and that of its licensees, it took. The court's conclusion on this issue was based on strong evidence.

\* \* \* \* \*

548

The foregoing decisions make it amply clear that the fact that the tribal lands now comprising Red Lake Indian Reservation were never formally ceded to the United States would have no bearing or effect on the latter's sovereignty over such area, and that accordingly when the United States authorized creation of Minnesota as a separate state and transferred to it the lands now situate within its present boundaries, without any reservation of jurisdiction insofar as the Indian lands therein are concerned, it thereby established the state's authority and jurisdiction over crimes committed by non-Indians against non-Indians upon Indian lands within the state including those comprising the Red Lake Indian Reservation.[7]

■ Provisions to the effect that new territories and states admitted to the Union shall never interfere with the primary disposal of the soil within the same by the United States, as set forth in the Northwest Ordinance; or the Organic Act establishing the territorial government of Minnesota (9 Stat. 403); or the Enabling Act of February 26, 1857, authorizing the creation of the State of Minnesota (11 Stat. 166), have been construed to have reference to disposal of

---

"* * * We think this evidence introduced by both sides confirms the Court of Claims' conclusion that the petitioner's use of its lands was like the use of the nomadic tribes of the States Indians.

\*   \*   \*   \*   \*

"In the light of the history of Indian relations in this Nation, no other course would meet the problem of the growth of the United States except to make congressional contributions for Indian lands rather than to subject the Government to an obligation to pay the value when taken with interest to the date of payment. Our conclusion does not uphold harshness as against tenderness toward the Indians, but it leaves with Congress, where it belongs, the policy of Indian gratuities for the termination of Indian occupancy of Government-owned land rather than making compensation for its value a rigid constitutional principle." (Italics supplied.)

[7] By 67 Stat. 588, 18 USCA, § 1162, enacted August 15, 1953, the United States expressly granted to Minnesota jurisdiction over *all offenses committed by or against Indians in all areas of Indian country* within the state *except the Red Lake Indian Reservation,* which would imply its recognition of the state's existing jurisdiction over crimes committed by non-Indians against non-Indians within such reservation as herein determined.

lands by the United States by transfer through patent or deed executed by its officers under authority of Congress. Oury v. Goodwin, 3 Ariz. 255, 26 P. 376; Topeka Commercial Security Co. v. McPherson, 7 Okla. 332, 54 P. 489. This construction, which appears sound, would indicate that the provisions described would have no bearing upon the determination of the issue here presented.

The order overruling the demurrer interposed herein is in all respects affirmed.

Affirmed.