IN RE APPLICATION OF COUNTY OF BELTRAMI TO
DETERMINE SETTLEMENT OF JOYCE, WILLIAM,
FRANK, AND GENIVA BEAULIEU.
COUNTY OF HENNEPIN, APPELLANT.

119 N. W. (2d) 25.

January 11, 1963—No. 38,480.

*George M. Scott,* County Attorney, and *Thomas M. Bambery,* Assistant County Attorney, for appellant.

*Herbert E. Olson,* County Attorney, and *Robert K. Severson,* Assistant County Attorney, for respondent.

*Melvin L. Wulf* and *Shirley Fingerhood,* for American Civil Liberties Union, amicus curiae.

*Robert G. Share,* for Minnesota Branch, American Civil Liberties Union, amicus curiae.

*Arthur Lazarus, Jr., Richard Schifter,* and *Strasser, Spiegelberg, Fried, Frank & Kampelman,* for Association on American Indian Affairs, Inc., amicus curiae.

*Ramsey Clark,* Assistant Attorney General, and *Roger P. Marquis* and *Hugh Nugent,* for United States, amicus curiae.

ROGOSHESKE, JUSTICE.

Appeal from a judgment entered pursuant to an order determining that Hennepin County is responsible to provide poor relief for certain children enrolled as members of the Red Lake Band of Chippewa Indians, and that such children have not acquired legal settlement in Beltrami County for poor-relief purposes.

The key question presented is whether enrolled members of such Indian band while residing on the Red Lake Reservation in Beltrami County can acquire legal settlement for poor-relief purposes in that county within the contemplation of Minn. St. 261.07. The answer to this question is necessary in order to fix responsibility for their support under our poor-relief laws. Since both political subdivisions involved here administer poor relief under the county system, it is agreed that, if such persons can acquire a legal settlement, Beltrami County is responsible; if not, the responsibility rests upon Hennepin County.

A brief stipulation of facts establishes that Alice Beaulieu, the unmarried mother of four indigent tribal-Indian children, was born October 4, 1929, on the Red Lake Indian Reservation in Beltrami County. While she lived on the reservation with her parents she gave birth to the four children; namely, Joyce, William, Frank, and Geniva, now respectively 16, 13, 10, and 8 years of age. The children and their mother, all being enrolled members of the Red Lake Band of the Chippewas, lived on the reservation until June 1955 when they moved to Minneapolis in Hennepin County. At the time they moved, and until July 1956, the children were receiving public assistance in the form of Aid to Dependent Children from Beltrami County. At that time they acquired residence in Hennepin County for purposes of receiving such aid and continued to receive it from that county.[1] On March 22, 1956,

---

[1] Responsibility for ADC is not determined by settlement for poor-relief

the mother was adjudged mentally ill by the Hennepin County Probate Court. She was committed to the Fergus Falls State Hospital where she remains confined. After her commitment the aid for the children was paid to their maternal grandmother until February 25, 1958, when they were committed as dependent and neglected children to the temporary custody of the Hennepin County Welfare Board and placed in foster care by the Hennepin County Juvenile Court.

Upon commitment of the children, eligibility for ADC ceased to exist. When the question arose as to where the children were settled for poor-relief purposes, the Juvenile Court of Hennepin County denied settlement in that county and transferred the case to the Beltrami County Juvenile Court. Thereafter Beltrami County Juvenile Court denied settlement and certified the proceedings to the Commissioner of Public Welfare for determination of the place of settlement.[2] The commissioner certified that the children had settlement in Beltrami County by derivation from their mother.[3] Thereupon Beltrami County applied to the district court for a judicial determination of the issue. Upon these stipulated facts, the district court ruled that the children were unsettled persons because the mother, and therefore her children, did not acquire settlement while living on the reservation; and therefore, under the poor laws, Hennepin County was responsible for their support. Hennepin County appeals.

The contentions of Beltrami County and the decision of the court appear to rest upon the fact that the Red Lake Reservation is no ordinary reservation and that the enrolled members of the Chippewas who reside there have a status different from that of nearly all

---

purposes but by the period of residence, i. e., physical habitation. Minn. St. 256.73 and 256.79; see, State ex rel. Timo v. Juvenile Court, 188 Minn. 125, 246 N. W. 544.

[2] Minn. St. 261.123.

[3] No one challenges that settlement, if acquired, must derive from their mother's prior residence on the reservation. § 261.07, subd. 3. Illegitimate minor children establish settlement by derivation from their mother. In re Settlement of Sonnenberg, 256 Minn. 571, 99 N. W. (2d) 444. The period during which the mother received ADC must be excluded in determining settlement under § 261.07, subd. 2.

other tribal Indians residing on Indian reservations within the several states. Beltrami County argues that such status compels a conclusion that the state does not have jurisdiction over either the territory or the residents, and is thereby prevented from any enforcement of the poor laws within the territory embraced by the reservation. It is urged that these reservation Indians are governed solely by tribal and Federal law and their welfare in time of need is exclusively a problem for themselves and the Federal government; that no tribal resident of the reservation has a "legal right" to support from Beltrami County and, therefore, cannot acquire a settlement for poor-relief purposes while living on the reservation. Hennepin County and amici curiae[4] contend that all reservation Indians are residents of the state and county in which their reservation is located; that Federal jurisdiction is not exclusive; that such Indians are not the sole responsibility of the Federal government; and that a denial of legal settlement in effect violates civil rights statutes and the constitutional mandate for equal protection of the laws.

1.   It has long been the unequivocal policy of our state, as declared by our statutes and decisions, that any person living in Minnesota and in need of the commonly recognized necessities of life, who for any reason is unable to earn a livelihood and is without near of kin upon whom to depend, shall be cared for at public expense.[5] Under our statutes it appears to have been intended that the responsibility for furnishing this type of public charity, commonly called poor relief, shall rest initially upon the political subdivision in which the pauper lives and applies for assistance[6] and, ultimately, upon the political subdivision in which the pauper has, as provided by § 261.07, acquired a settlement for poor-relief purposes.[7]

---

[4]Briefs amicus curiae in support of Hennepin County's position were filed by the Association on American Indian Affairs, Inc., the American Civil Liberties Union and its Minnesota branch, and the United States.

[5]§§ 261.01 and 261.03; County of Redwood v. City of Minneapolis, 126 Minn. 512, 148 N. W. 469; Village of Litchfield v. County of Meeker, 182 Minn. 150, 233 N. W. 804.

[6]Hendrickson v. Town of Queen, 149 Minn. 79, 182 N. W. 952.

[7]In re Larson, 215 Minn. 599, 11 N. W. (2d) 145; Warren Hospital Assn. v. Town of Middle River, 183 Minn. 230, 236 N. W. 211.

Because ultimate liability and the rights thereby resulting to a political subdivision are determined by the place of settlement, that word and any of its synonyms,[8] when used in connection with poor relief, are intended to have a special meaning. As used in § 261.07, settlement is not synonymous with either residence or domicile.[9] The mere fact of residence in a particular political subdivision in the nontechnical sense of mere physical habitation is not enough to entitle a pauper to anything more than temporary poor relief[10] except in the case of an emergency.[11] Such residence must not only be continuous for the statutory period (now one year) but, in computing such period, time during which a person received assistance generally must be excluded to the end that the peculiar statutory character of residence will ripen into legal settlement. As we said in County of Redwood v. City of Minneapolis, 126 Minn. 512, 515, 148 N. W. 469, 470:

"* * * The place of a person's settlement is the place where he has a legal right to support if he becomes a public charge. * * * When it is said that a person has his settlement in a particular municipality the meaning is, not that he is now a dependent there, but that he has, in case of need, a right to support from the inhabitants of that municipality."

It is apparent that settlement involves more than mere physical habitation. To acquire settlement, residence must be uninterrupted for the period and under the conditions imposed by the statute. This special meaning of settlement gives expression to the legislative intent underlying § 261.07 and all interrelated statutes that the public duty to support the needy poor should be imposed upon the political subdivision which received the benefits of their residence during the years preceding their need for public assistance.[12] The right to receive

---

[8]E. g., legal settlement or residence for poor-relief purposes.

[9]State ex rel. Timo v. Juvenile Court, *supra;* Town of Smiley v. Village of St. Hilaire, 183 Minn. 533, 237 N. W. 416; In re Leslie, 166 Minn. 180, 207 N. W. 323.

[10]State ex rel. Timo v. Juvenile Court, *supra.*

[11]Hendrickson v. Town of Queen, *supra.*

[12]This policy is directed at the problem of ultimate responsibility for

this relief in a real sense stems from a community's moral obligation to take care of one who formerly contributed to its support in ways normally required of self-supporting residents. In summary, it can be declared that the place of settlement is the political subdivision in which a pauper has a right to expect reciprocal treatment or, as we have previously declared, "the place where he has a legal right to support."[13]

This brings us to the problem of whether or not the mother, and therefore the children, have a legal right to support from Beltrami County within the legislative contemplation of § 261.07.

This section is an inseparable part of our poor-relief law. In ascertaining legislative intent every law should be interpreted and construed, if possible, to give effect to all of its provisions;[14] and it is presumed that the legislature intends that the entire statute be given effect.[15] Sections of our law creating liabilities and imposing duties on paupers and their relatives, as well as those dealing with the rights and liabilities of the public authorities charged with the administration of poor relief, must therefore be collectively considered. By express statute[16] designed to modify the common-law rule of nonliability,[17] a pauper or his estate may be held liable under circumstances where property belonging to the pauper and sufficient for self-support is discovered to have been in existence at the time of furnishing poor aid. It is well settled that a pauper or his estate can be held liable for relief disbursed through fraud or deception as to his ability to support

---

poor relief rather than the overriding policy that no person shall suffer for want of the necessities of life whether settled or unsettled. Hendrickson v. Town of Queen, *supra*.

[13]County of Redwood v. City of Minneapolis, 126 Minn. 512, 515, 148 N. W. 469, 470; In re Leslie, 166 Minn. 180, 182, 207 N. W. 323, 324.

[14]§ 645.16.

[15]§ 645.17(2).

[16]§ 261.04, subd. 1.

[17]Before enactment of § 261.04, subd. 1, this court held in County of Brown v. Penkert, 164 Minn. 55, 204 N. W. 469, that the pauper's estate was not liable for the county's contribution to the pauper's support. See, 70 C. J. S., Paupers, § 64; 48 C. J., Paupers, § 202.

himself.[18] While we have not had occasion to consider the problem directly, it appears that, under proper circumstances, authorities charged with the administration of poor relief may exercise discretion in requiring the services or earnings of a pauper in aid of, or as a condition for, his maintenance at public expense.[19] Moreover, statutory authority requires that relatives, including parents and grandparents, having sufficient ability, must be called upon to support any indigent child and, upon a failure or refusal to do so, the political subdivision furnishing such support may sue to recover any sum so expended.[20]

The obligations of a pauper and his relatives are imposed as a consequence of the pauper's right to support. Such obligations create an equal right in the public authorities for the enforcement of these obligations.

Provisions dealing with the rights and liabilities of public authorities in discharging duties to support the needy poor also affect the pauper's legal right to support. These relate to the duty of public authorities to give a warning to depart and to proceedings for removal. When a pauper applies for relief in a county other than that of his settlement, the county board has a duty to warn him to depart, and upon his inability or refusal to do so, the board may by order to the sheriff effect the pauper's departure to his place of settlement.[21] One of the statutes relating to a judicial determination of settlement requires the court to order removal of the pauper to the place of his legal settlement as determined in such proceedings.[22]

Viewed collectively, these statutory provisions demonstrate that, if a pauper acquires a settlement—within the statutory meaning of that term—his right to support gives rise to an equal right in a political subdivision other than the place of his settlement to require that he receive such support from the subdivision in which he is settled; and that

---

[18]County of Brown v. Penkert, *supra*; 48 C. J., Paupers, § 202.

[19]§ 262.01; 48 C. J., Paupers, § 253.

[20]§§ 261.01 and 261.02.

[21]§ 262.11; Lovell v. Seeback, 45 Minn. 465, 48 N. W. 23, 11 L. R. A. 667.

[22]§ 261.09; Robinette v. Price, 214 Minn. 521, 8 N. W. (2d) 800.

he and his near of kin residing in Minnesota be subject to the enforcement of the obligations imposed upon them.

2. Minnesota does not have general jurisdiction over enrolled members of the Red Lake Band of the Chippewas residing on their reservation. Beltrami County correctly insists that this reservation enjoys a peculiar status among Indian reservations in this and other states.[23] The Federal government has never transferred its exclusive and unlimited jurisdiction over this territory and the tribal members living there to our state except to enforce state sanitation and quarantine laws, to make inspection of health and educational conditions, and to enforce our compulsory school attendance laws.[24] All other civil and criminal jurisdiction over these Indians expressly or by implication remains vested in the Federal government, exercised either by it or by the Indians under authorized tribal self-government. With an apparent design to effect a withdrawal of Federal jurisdiction over reservation Indians, Congress in 1953 enacted Public Law 280.[25] This law did not change the status of this reservation. A brief history of the relationship of the Chippewas with the Federal and state governments is set forth in Note, 39 Minn. L. Rev. 853. Concerning Public Law 280, it is there observed (p. 865):

"Certainly the most important piece of recent legislation affecting the Minnesota Chippewas was adopted in 1953, by which federal criminal and civil jurisdiction over Indians on reservations was transferred to Minnesota and four other states. This would appear to be one of the preliminary steps to the complete federal withdrawal contemplated by the Hoover Commission in 1949. This act transferring jurisdiction to the states involved, known as Public Law 280, excepted certain reservations in Minnesota, Oregon and Wisconsin from its sweeping provisions. In Minnesota the Red Lake Reservation is specifically excluded."[26]

---

[23] Our search indicates that only the Warm Springs Reservation in Oregon and the Annette Islands Reservation in Alaska possess similar status.

[24] 45 Stat. 1185, as amended by 60 Stat. 962, 25 USCA, § 231.

[25] 67 Stat. 588. Pertinent provisions, as amended, now are 28 USCA, § 1360, and 18 USCA, § 1162.

[26] See, also, the evolution of the relationship between Indians and the

It is unchallenged that the reason the Red Lake Band was excluded from the provisions of that act was their opposition to being included; the exclusion was in deference to their wishes.[27]

However, retention of jurisdiction by the Federal government does not absolutely preclude the exercise of state power over territory located within its geographical sovereignty. Prior to congressional enactments declaring Indians to be citizens of the United States, we have held that Indians living on the Red Lake Reservation are residents of Minnesota within the meaning of Minn. Const. art. 7, § 1, before its amendment in 1960. Opsahl v. Johnson, 138 Minn. 42, 163 N. W. 988. We recently made plain the nonexclusive character of Federal jurisdiction over this reservation in State v. Holthusen, 261 Minn. 536, 113 N. W. (2d) 180. We there held that the state has jurisdiction over crimes committed by non-Indians against non-Indians within the territorial limits of the reservation. In Williams v. Lee, 358 U. S. 217, 79 S. Ct. 269, 3 L. ed. (2d) 251, and in a recent decision, Kake Village v. Egan, 369 U. S. 60, 82 S. Ct. 562, 7 L. ed. (2d) 573, the United States Supreme Court declared that even where the Federal government has expressly reserved "absolute" jurisdiction over the affairs of the Indians within a state this does not mean the Federal government has reserved "exclusive" jurisdiction. Mr. Justice Frankfurter, speaking for the court in the Kake case, after an extensive review of authorities, states (369 U. S. 75, 82 S. Ct. 571, 7 L. ed. [2d] 583):

"* * * even on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law."

In Metlakatla Indians v. Egan, 369 U. S. 45, 82 S. Ct. 552, 7 L. ed. (2d) 562, a companion case to the Kake case, the court held that the application of state law is precluded where tribal Indians living on a reservation are governed pursuant to Federal regulation or tribal authority granted by treaty or Federal statutes.

---

states traced by Mr. Justice Frankfurter in Kake Village v. Egan, 369 U. S. 60, 71, 82 S. Ct. 562, 568, 7 L. ed. (2d) 573, 581.

[27]Note, 39 Minn. L. Rev. 853, 867.

Thus, it must be regarded as settled, as urged by Hennepin County and amici curiae, that the jurisdictional force of state law extends over tribal Indians living on the Red Lake Reservation unless the exercise of such jurisdiction by the state would impair a right granted or reserved by Federal law or interfere with tribal self-government.[28]

Even though it is outside the stipulated facts, it appears to be undisputed that the Red Lake Band of the Chippewas are in large measure self-governed. Agencies established by this band have long existed to meet the problem of enforcing tribal law on the reservation.[29] Further facts recited in its brief by Beltrami County tend to support the contention that the relief needs of these Indians are presently provided for pursuant to Federal authority. The funds are administered cooperatively by the Department of the Interior and the tribal organization. Although this is likewise not disputed, Hennepin County and amici curiae argue that such practice has no relevancy to the question presented because the Federal government is not legally bound to provide such relief; it does so only as a gratuity and only if Congress appropriates funds therefor. We agree that facts relating to the nature and extent of Federal relief grants are not essential to this decision. However, the existence of such a program administered by Federal and tribal authorities does, we believe, indicate that interference with such authorities will likely occur if public authorities of this state attempt to exercise administrative supervision in making poor-relief grants to Indians living upon the reservation.

More directly, a conflict of jurisdiction would result from the enforcement of our poor-relief laws regardless of the existence of a Federal tribal poor-relief program. In the absence of general jurisdiction over these Indians, the poor-relief laws which impose duties and liabilities on paupers, as well as those which vest rights in and impose duties on public authorities, could not be enforced without direct interference with tribal self-government and direct conflict with reserved Federal

[28]State v. Jackson, 218 Minn. 429, 16 N. W. (2d) 752, is undoubtedly superseded by Public Law 280 and its holding modified by Kake Village v. Egan, *supra*.

[29]39 Minn. L. Rev. 866.

jurisdiction. The jurisdictional force of our poor-relief laws does not extend to tribal Indians living on this reservation, by express Federal law. They cannot be reached by state process, nor can any order or judgment following a properly instituted action be enforced against any Indian or his estate who remains within the territory embraced by the reservation. While they are citizens and residents of Minnesota, there is absent from this status the peculiar statutory character of residence necessary to acquire settlement within the contemplation of § 261.07. During the period that these Indians maintain a residence immune from the jurisdiction of our poor-relief laws as required to be administered by Beltrami County, such residence cannot ripen into a settlement in that county.

This conclusion does not deprive these children of the right to receive poor relief but determines only which of two political subdivisions is responsible for such relief now being supplied. Thus, constitutional questions of equal protection, and questions relating to rights granted under the Federal Civil Rights Act, are not presented; nor do the stipulated facts permit or require us to decide whether a tribal resident of this reservation is entitled to receive relief from Beltrami County as an unsettled pauper. Although the reasoning of our decision may be relevant to these problems, the facts necessary for their presentation are not before us and this decision should not be regarded as determinative of them.

Affirmed.

MR. JUSTICE SHERAN, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.