# COMMISSIONER OF TAXATION v. FRANCIS N. BRUN AND ANOTHER.

174 N. W. (2d) 120.

January 23, 1970—No. 41410.

*Hoag, Edwards, Edgerton, Theobald & Rieschl* and *Rodney J. Edwards,* for relators.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, and *Don G. Paterick* and *Gerald T. Laurie,* Special Assistant Attorneys General, for respondent.

KNUTSON, CHIEF JUSTICE.

Certiorari to review a decision of the Minnesota Tax Court involving the right to collect a state income tax from members of the Red Lake Band of Chippewa Indians.

The facts have either been stipulated by the parties or are not in dispute. Both Francis N. Brun and Barbara A. Brun are enrolled members of the Red Lake Band of Chippewa Indians and live on the Red Lake Reservation. Francis Brun was employed by the tribal sawmill located on the reservation and owned and operated as a Red Lake Band tribal enterprise. Barbara Brun was employed on the Red Lake Reservation as a clerk for the Bureau of Indian Affairs, United States Department of the In-

terior. Francis earned $5,511.20 as an accounting clerk in the year 1964. Of this, $94 was withheld for Minnesota income tax. Barbara earned $4,460.80 as a clerk in 1965, of which $101.30 was withheld by the State of Minnesota for income tax. Federal income taxes were also withheld from the income of each individual. They both applied for a refund from the state. Their applications were denied by the commissioner of taxation, and on appeal he was upheld by the Tax Court.

The Red Lake Band of Chippewa Indians is an American Indian tribe located on the Red Lake Reservation within the boundaries of the State of Minnesota. The band has self-government under their current revised constitution and bylaws approved November 10, 1958. Under the constitution and bylaws the jurisdiction of the Red Lake Band extends to all lands of the reservation within the state. The governing body of the tribe is composed of the elected representatives of the Tribal Council.

The case presents only one question, namely, may the State of Minnesota levy an income tax on wages earned from employment on the Red Lake Reservation by an enrolled member of the Red Lake Band of Chippewa Indians residing within the boundaries of the reservation.

We have had occasion to consider the unique status of the Red Lake Band of Chippewa Indians in a number of cases. It is clear that members of this tribe occupy a status not common to other Indians in the state. It would serve no useful purpose to discuss at length the unique status that this tribe enjoys or the reasons why the state cannot deal with them as it does with Indians in other parts of the state. It is enough to say that the Federal government has not granted to the state civil or criminal jurisdiction over members of this tribe. As we have frequently said, when Congress enacted Public Law 280 (67 Stat. 588,[1] 18 USCA, § 1162, and 28 USCA, § 1360) in 1953, which conferred on the state civil and criminal jurisdiction over other Indians in the

---

[1] Subsequently amended by 68 Stat. 795 and 72 Stat. 545.

state, it expressly excepted the Red Lake Reservation. In State v. Jackson, 218 Minn. 429, 16 N. W. (2d) 752, decided before the enactment of Public Law 280, we held that a tribal Indian could not be prosecuted by the state for shooting game out of season for consumption by himself and his family where the shooting occurred within the limits of the reservation of his tribe, upon ceded land not allotted to or occupied by him but allotted to a deceased Indian of the same tribe, no fee simple patent having been issued.

We have considered the status of the Red Lake Band of Chippewa Indians in several cases subsequent to the enactment of Public Law 280. In State v. Holthusen, 261 Minn. 536, 113 N. W. (2d) 180, we held that a non-Indian could be prosecuted for the murder of another non-Indian within the boundaries of the Red Lake Reservation. There we discussed the status of the Red Lake Reservation and its member Indians at length. In In re Settlement of Beaulieu, 264 Minn. 406, 119 N. W. (2d) 25, we held the enforcement of poor relief laws does not extend to members of the Red Lake Band while residing upon the Red Lake Reservation, because such residence does not ripen into legal settlement in the county within which the reservation is located. In State v. Lussier, 269 Minn. 176, 130 N. W. (2d) 484, we held that the state is without jurisdiction to prosecute a member of the Red Lake Band for burglary against the property of an Indian or another person within the Red Lake Reservation regardless of the ownership of the plot where the offense occurred. Finally, in Sigana v. Bailey, 282 Minn. 367, 164 N. W. (2d) 886, we held that the courts of the State of Minnesota have no jurisdiction over a tort action arising out of a collision between automobiles owned by enrolled members of the Red Lake Band of Chippewa Indians which occurred within the territorial limits of the Red Lake Indian Reservation, even though the collision occurred on a state trunk highway which is maintained by the Minnesota Department of Highways. For an earlier discussion of the rights of tribal Indians, see Opsahl v. Johnson, 138 Minn. 42, 163 N. W. 988.

While its ruling is not a judicial decision, the Minnesota Department of Employment Security has determined that members of the Red Lake Band of Indians are not liable to make contributions to the Minnesota unemployment fund. In the Matter of Determination of Employer Liability of Red Lake Band of Chippewa Indians (Appeal No. 20-7-L-61 [269], June 14, 1962).

Thus, it seems clear that the Red Lake Band of Chippewa Indians within the boundaries of its reservation enjoys the autonomy that originally existed as to all Indians on reservations when Worcester v. Georgia, 31 U. S. 515 (6 Pet. 405), 8 L. ed. 483, was decided by the United States Supreme Court. Therein the rights of Indians on reservations were extensively discussed. The court said (31 U. S. 560 [6 Pet. 439], 8 L. ed. 501):

"The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of Congress. The whole intercourse between the United States and this nation, is, by our Constitution and laws, vested in the government of the United States.

\* \* \* \* \*

"\* \* \* [T]he Acts of Georgia are repugnant to the Constitution, laws and treaties of the United States.

"They interfere forcibly with the relations established between the United States and the Cherokee nation, the regulation of which, according to the settled principles of our Constitution, are committed exclusively to the government of the Union."

The above language, as has been pointed out in later cases, has been modified, and the Federal government has granted to the states civil and criminal jurisdiction over many other tribal Indians, but the Red Lake Band of Chippewa Indians still retains much of the autonomy originally referred to in Worcester, and the states may not interfere with this tribal self-government.

The land of the Red Lake tribe has never been formally ceded to the United States. For a comprehensive history of the formation of the Red Lake Reservation, see Minnesota v. Hitchcock, 185 U. S. 373, 22 S. Ct. 650, 46 L. ed. 954.

In the case of Williams v. Lee, 358 U. S. 217, 219, 79 S. Ct. 269, 270, 3 L. ed. (2d) 251, 253, the United States Supreme Court reaffirmed the basic rule of Worcester v. Georgia, *supra,* when it said:

"Despite bitter criticism and the defiance of Georgia which refused to obey this Court's mandate in *Worcester* the broad principles of that decision came to be accepted as law. Over the years this Court has modified these principles in cases *where essential tribal relations were not involved and where the rights of Indians would not be jeopardized,* but the basic policy of *Worcester* has remained." (Italics supplied.)

In Williams, the question was whether a non-Indian who operated a store on the Navajo reservation could sue an Indian in the Arizona state courts to collect for goods sold on credit. The court said (358 U. S. 223, 79 S. Ct. 272, 3 L. ed. [2d] 255):

"* * * [T]o allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves."

The question, then, in cases involving assertion of a right by the state against members of the Red Lake Band is whether the action of the state will undermine the tribe's right of self-government.

The state devotes a large part of its brief in the present case to quoting substantial portions of the court's opinion in Organized Village of Kake v. Egan, 369 U. S. 60, 82 S. Ct. 562, 7 L. ed. (2d) 573. It substantially ignores the companion case of Metlakatla Indian Community v. Egan, 369 U. S. 45, 82 S. Ct. 552, 7 L. ed. (2d) 562. Both of these cases involved the right of Indians to operate salmon-fishing traps. Kake involved the right

to operate off the reservation, and Metlakatla, apparently, on what had been created as a reservation. Neither of the cases involved a band of Indians anything like the Red Lake Band with which we are concerned. In Kake the court simply held that these Alaskan Indians were subject to Alaskan fishing laws. However, in Metlakatla, the court held that the secretary of the interior had paramount power to regulate the fishing rights of these Indians which Alaska could not abridge, but that the secretary had not exercised this authority. The court stated that if the secretary failed to act, the Metlakatlans would be subject to Alaskan regulation. It pointed out (369 U. S. 50, 82 S. Ct. 557, 7 L. ed. [2d] 567):

"The Indians of southeastern Alaska, who have very substantially adopted and been adopted by the white man's civilization, were never in the hostile and isolated position of many tribes in other States. As early as 1886 a federal judge, holding Alaskan Indians subject to the Thirteenth Amendment, denied that the principle of Indian national sovereignty enunciated in *Worcester v. Georgia,* 6 Pet. 515, applied to them. * * * There was never an attempt in Alaska to isolate Indians on reservations. Very few were ever created, and the purpose of these, in contrast to many in other States, was not to confine the Indians for the protection of the white settlers but to safeguard the Indians against exploitation. Alaskan Indians are now voting citizens, some of whom occupy prominent public office in the state government. * * * *Metlakatlans, the State tells us, have always paid state taxes,* in contrast to the practice described and prescribed for other reservations in *The Kansas Indians,* 5 Wall 737, and it has always been assumed that the reservation is subject to state laws. United States v. Booth, 17 Alaska, at 563, 161 F. Supp., at 270." (Italics supplied.)

The above language cannot by any means be applied to the Red Lake Band of Chippewa Indians.

The most recent case involving an analogous subject is War-

ren Trading Post v. Arizona Tax Comm. 380 U. S. 685, 85 S. Ct. 1242, 14 L. ed. (2d) 165. That case involved the right of Arizona to tax a company trading with the Navajo Indians on the reservation. The court held that Arizona could not tax such company since Congress had indicated that Indians were to be free from state interference and since the Federal government had regulated Indian traders under a comprehensive system of regulations and statutes. The court said (380 U. S. 690, 85 S. Ct. 1245, 14 L. ed. [2d] 168) :

"Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities. And in compliance with its treaty obligations the Federal Government has provided for roads, education and other services needed by the Indians. *We think the assessment and collection of this tax would to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts.* * * * And since Federal legislation has left the State with no duties or responsibilities respecting the reservation Indians, we cannot believe that Congress intended to leave to the State the privilege of levying this tax." (Italics supplied.)

The above statement would seem to apply to the enrolled members of the Red Lake Band of Indians residing on the Red Lake Reservation.

Very little help can be obtained from the decisions of other state courts for the reason that it is essential that in considering them we be mindful of the unique status of the Red Lake band of Chippewas. In the case of Your Food Stores, Inc. (NSL) v. Village of Espanola, 68 N. Mex. 327, 361 P. (2d) 950, the New Mexico court held that the state could not levy sales or use taxes

within the Indian reservation. It is interesting to note that in commenting on this decision in a footnote in Warren Trading Post v. Arizona Tax Comm. 380 U. S. 685, 691, 85 S. Ct. 1242, 1246, 14 L. ed. (2d) 165, 169, the court said:

"The Buck Act, now 4 U. S. C. §§ 105-110 (1964 ed.), in which Congress permitted States to levy sales or use taxes within certain federal areas, has been interpreted by what appears to be the only court to consider the question before this case, and by the Interior Department, as not applying to Indian reservations. *Your Food Stores, Inc. v. Village of Espanola,* 68 N. M. 327, 334, 361 P. (2d) 950, 955-956; 58 I. D. 562. Cf. 4 U. S. C. § 109 (1964 ed.), excepting taxes on Indians from the scope of the Act. *We think that interpretation was correct.*" (Italics supplied.)

In the later case of Ghahate v. Bureau of Revenue, 80 N. Mex. 98, 451 P. (2d) 1002, the New Mexico court held that a state income tax may be levied against Indians living on the Navajo Indian Reservation unless such application would interfere with the reservation's self-government or impair any right granted or reserved to the tribe by Federal law. It was, however, stipulated that the tribe would not be inconvenienced, nor was it interfered with by virtue of the fact that members of the tribe were required to pay the tax. The court, in an exhaustive opinion, distinguishes Your Food Stores, Inc. (NSL) v. Village of Espanola, *supra,* on the grounds that Espanola involved only the right to annex Pueblo land. The court does not refer to the footnote statement of the United States Supreme Court in Warren Trading Post v. Arizona Tax Comm. *supra,* which apparently considered the Espanola case as involving the right to impose a tax on Indians.

Other decisions of the United States Supreme Court, while sometimes difficult to reconcile, may be of some help.

In Choteau v. Burnet, 283 U. S. 691, 51 S. Ct. 598, 75 L. ed. 1353, the court held that the income received by a member of the

Osage tribe of Indians as his share of royalties from gas and oil leases was subject to Federal tax.

In Leahy v. State Treasurer, 297 U. S. 420, 56 S. Ct. 507, 80 L. ed. 771, the court held that a state income tax could be imposed by Oklahoma on enrolled members of the Osage tribe of Indians. However, in both of these cases the Indians held certificates of competency. They were not Indians such as the Red Lake Band of Chippewas, having their own government. As a matter of fact, the court in Oklahoma Tax Comm. v. United States, 319 U. S. 598, 603, 63 S. Ct. 1284, 1286, 87 L. ed. 1612, 1616, holding a state inheritance tax could be applied to Oklahoma Indians, said:

"The underlying principles on which these decisions are based do not fit the situation of the Oklahoma Indians. Although there are remnants of the former tribal sovereignty, these Indians have no effective tribal autonomy, as in *Worcester v. Georgia, supra,* and, unlike the Indians involved in *The Kansas Indians* case, *supra,* they are actually citizens of the State, with little to distinguish them from all other citizens except for their limited property restrictions and their tax exemptions."

In Superintendent of Five Civilized Tribes v. Commr. of Int. Rev. 295 U. S. 418, 55 S. Ct. 820, 79 L. ed. 1517, the court held that income on funds derived from the restricted allotment of a fullblood Creek which are in excess of his needs is subject to a Federal income tax. That case also can be distinguished from the one before us because the income there came from outside the reservation. The tax was applied to investment income derived from the Indian's allotted land. The court said that the land was exempt by act of Congress but the income derived from the investment of surplus income from the land was not exempt.

Two United States Courts of Appeal have held that reservation Indians are subject to Federal income taxes for income earned on the reservation. In Commr. of Int. Rev. v. Walker (9 Cir.) 326 F. (2d) 261, 263, the court upheld the Federal income tax levied

against the earnings of Walker as elected treasurer of the Indian community. In so doing, the court said:

"A general Act of Congress applying to all persons includes Indians and their property interests. Federal Power Commission v. Tuscarora Indian Nation, 362 U. S. 99, 116, 80 S. Ct. 543, 553, 4 L. Ed. 2d 584 (1960). Sections 1 and 61(a) of the Internal Revenue Code of 1954 subject the income of 'every individual' to tax, and include income 'from any source whatever', that is not elsewhere specifically excluded. Because the Internal Revenue Code is a general Act of Congress, it follows that Indians are subject to payment of federal income taxes, as are other citizens, unless an exemption from taxation can be found in the language of a Treaty or Act of Congress."

In Holt v. Commr. of Int. Rev. (8 Cir.) 364 F. (2d) 38, certiorari denied, 386 U. S. 931, 87 S. Ct. 952, 17 L. ed. (2d) 805, the court held a noncompetent Indian was subject to Federal income tax for income derived from renting and farming operations of land located on the reservation.

However, these opinions are hardly authority for the proposition that inasmuch as the Federal government, which acts as the trustee for the Indian wards, may impose a Federal income tax on their income, the state has the same right. While an exemption must be found in the Federal income tax law before immunity exists, the opposite is true of an Indian reservation such as we have before us, in that before the state can encroach upon sovereignty of the reservation, the right must be given to the state by the Federal government. No such right has been given to the state here. In other words, we must not lose sight of the type of reservation we are dealing with and the authority that has been given to the state by the Federal government to regulate the affairs of the residents on that reservation.

Thus, while it is difficult to reconcile some of these cases, they cannot be applied without comparing their facts with the facts before us.

As we have pointed out in former decisions of this court, few Indian tribes in the United States retain the sovereignty and the right to self-government retained by the Red Lake Band of Chippewa Indians. The time may come when the Federal government will give the state civil and criminal jurisdiction over this band of Indians as well as others within the state, but until that time comes we are of the opinion that the state cannot impose taxes upon enrolled members of the tribe earning, as they do in this case, money from projects intended for the welfare and support of the members of the tribe. It cannot be argued that siphoning off part of the earnings from employees of a sawmill operated for the benefit and welfare of enrolled members of the tribe does not interfere with the tribal right of self-government.

Our income tax is a personal debt under Minn. St. 290.54.[2] The state has not shown how the tax can be enforced, except by withholding, inasmuch as process cannot be served on an enrolled member of the Red Lake Band of Chippewa Indians on the reservation, nor can judgment against such an individual be enforced. In re Settlement of Beaulieu, 264 Minn. 406, 119 N. W. (2d) 25. Nor do we see how failure to file a return or pay the tax can be enforced by criminal sanctions under Minn. St. 290.53, subd. 4, or 290.93, subd. 11, inasmuch as we have no criminal jurisdiction over members of this tribe.

We assume that if the employer here refused to withhold the taxes the state would also be without a remedy. Under these circumstances we are convinced that the Tax Court erred in holding that the state income tax applies to the enrolled members of the Red Lake Band of Chippewa Indians here involved. We are not passing on the right to collect income taxes from Indians over whom the state has been granted civil and criminal jurisdiction by the Federal government.

The net proceeds of our state income tax are dedicated to our schools under Minn. St. 290.62. While the state in its brief lists

---

[2] See, Irvine v. Spaeth, 210 Minn. 489, 299 N. W. 204.

large sums of money paid by the state to Minnesota Indians for schools and welfare, it fails to segregate such payments or to show that they have been paid for the direct benefit of enrolled members of the Red Lake Band of Indians living on the Red Lake Reservation. In the absence of such showing, the facts are of little value in establishing what we assume the state has in mind—that, inasmuch as the Indians involved receive these benefits from the state, they should carry their fair share of the burden of paying for them.

Reversed.

MR. JUSTICE ROGOSHESKE took no part in the consideration or decision of this case.