**OMAHA TRIBE OF INDIANS et al.,**
**Plaintiffs,**

v.

**William A. PETERS, Individually and as Nebraska State Tax Commissioner, and the Nebraska Department of Revenue, Defendants.**

Civ. 74–L–13.

United States District Court,
D. Nebraska.

Oct. 1, 1974.

Daniel H. Israel, Boulder, Colo., and James R. Peterson, Winnebago, Neb., for plaintiffs.

Clarence A. H. Meyer, Atty. Gen., and Ralph H. Gillan, Asst. Atty. Gen., Lincoln, Neb., for defendants.

## MEMORANDUM

RICHARD E. ROBINSON, Senior District Judge.

This matter is before the Court on the parties competing motions for summary judgment. The jurisdiction of the Court is established under 28 U.S.C.A. §§ 1331 and 1362. The matter has been submitted to the Court on the parties pleadings and briefs and the Court is now prepared to rule.

The facts of the case are not in dispute. Plaintiffs are the Omaha, Santee Sioux and Winnebago Tribes of Indians, and three individual members of those tribes. Each of the tribes has a reservation in the State of Nebraska. Each of the individuals reside and are employed wholly upon one of the reservations. Each individual plaintiff has been subjected to income tax by the defendant Department of Revenue, and Director of Revenue of the State. Plaintiffs contend that the State income tax was unlawfully applied to them under the rule of McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 [1973].

In *McClanahan* a unanimous Supreme Court held that an Indian's income derived from employment performed wholly on an Indian reservation could

not be subjected to state income taxes. The present case raises a question of law expressly reserved in *McClanahan*. That is, whether or not a state which has assumed civil jurisdiction over an Indian reservation pursuant to Act of Aug. 15, 1953, Public L. No. 83–280, § 4, 67 Stat. 588, 589 [1] may collect income taxes from tribal members who reside and are employed wholly upon the reservation.

Before turning to the issue in this case it will be helpful to further develop the facts and holding of *McClanahan*.

In that case the State of Arizona attempted to impose its income tax on the petitioner, a Navajo Indian, who was employed wholly upon the Navajo reservation. Though the State had no civil or criminal jurisdiction over the reservation, the State reasoned that the assessment of income taxes against individual Indians would not jeopardize the self-government of the Navajo tribe and, therefore, the tax was not unlawful under the rule of Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 [1959]. The Supreme Court, however, found the *Williams* rule to be inapplicable in this situation. The Court found that the State's authority to tax Indians on an Indian reservation depended not upon the tribe's rights of self-government, but rather upon the individual's rights as an Indian under prior decisional law, treaties and statutes.

Though the Court found no express grant of Indian immunity to state revenue laws either in applicable treaties or federal statutes, it did find language which arguably supported the notion that state governments did not have the authority to tax Indian incomes. It noted that the Navajo treaty set aside designated lands for their use and occupation and prohibited non-tribal members from entering onto tribal lands. It also noted that the Buck Act, 4 U.S.C.A. § 105 et seq. which subjected persons living on a federal reservation to state sales, use and income taxes, expressly excluded Indians "not otherwise taxed" from its provisions. Finally, it noted that the Arizona Enabling Act, 36 Stat. 557, A.R.S., required the state to recognize the Indian reservations within its borders and prohibited the state from taxing lands within an Indian reservation. All of these factors, the Court reasoned, had to be viewed against the backdrop of the notions of Indian sovereignty developed in the cases of Worcester v. Georgia, 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 [1832], and The Kansas Indians, 72 U.S. 737, 5 Wall. 737, 18 L.Ed. 667 [1867] and refined in latter cases such as Williams v. Lee, *supra*. The Court apparently recognized that the Indian sovereignty doctrine had measurably changed over the years and that it alone would not support an Indian state tax immunity. However, all of the noted factors led the Court to its holding that such an immunity existed. This view was reinforced by the observation that in the absence of state jurisdiction within the Indian reservation, the state would be powerless to enforce its revenue laws as against reservation Indians.

The *McClanahan* decision would dispose of this case were it not for the following statute which clearly applies to the facts of the present case.

§ 1360 State civil jurisdiction in actions to which Indians are parties:

"(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State . . . to the same extent that such State . . . has jurisdiction over other civil causes of action, and those civil laws of such State . . . that are of general application to private persons or private property shall have the same force and effect within such Indian country

---

1. For the current status of this act *see* 28 U.S.C.A. § 1360 [1962] and 25 U.S.C.A. § 1321 [Supp. 1964].

as they have elsewhere within the State . . . :

"State . . . of Indian country affected

. . . . . .

Nebraska _ _ _ _ All Indian country within the State

. . . . . .

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property . . . belonging to any Indian . . . that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto. . . ."

Act of Aug. 15, 1953, Public L. No. 83–280, § 4, 67 Stat. 588, 589. [hereinafter referred to as P.L. 280].

The language and intended purpose of the above statute bears significantly on the rationale employed in *McClanahan*. The language in subsection [a] of the above-quoted statute is a sweeping grant of jurisdiction to the State of Nebraska to govern the lives and affairs of Indians living on an Indian reservation.[2] Plaintiffs contend, however, that the Indian immunity found by the Court in *McClanahan* has not been expressly or impliedly repealed by Congress through P.L. 280. They base this contention on several

theories which may be fairly summarized as follows: [1] The reluctance of Courts to interpret new laws as impliedly repealing long-standing federal treaties, statutes or policies; and [2] the fact that subsection [b] of P.L. 280, withholding certain powers from the states, indicates that Congress intended to retain powers over the commerce and properties of Indians, thereby preventing the state from enforcing its revenue laws against the plaintiffs.

■ As to plaintiff's first contention, it should be noted that P.L. 280 does not subject Indians to the jurisdiction of the state *by implication*. The statute is a clear and express grant of power subject only to the limitations stated in the ensuing sections of the statute. The question here is whether this broad and express grant of power includes the state's power to tax. The Court finds that subsection [a] does include such power. It is persuaded to that view for several reasons.

First of all, while *McClanahan* held that reservation Indians who earned their income on the reservation could not be subjected to a state income tax when the state had no jurisdiction over the Indians or Indian country, the underlying rationale of that case cannot prevail when, as here, the state clearly does have jurisdiction over the tribe.

■ There can be no question as to Congress' plenary power over Indian tribes within the boundaries of the United States. United States v. Kagama,

2. The Act of August 15, 1953, Public Law No. 83–280, 67 Stat. 588, conveyed both civil *and* criminal jurisdiction over Indian country in the State of Nebraska. However, in 1969 the Nebraska legislature passed a resolution, pursuant to 25 U.S.C.A. § 1323 [Supp.1974] which retroceded its jurisdiction over criminal offenses committed by or against Indians on the Omaha reservation in Thurston County, Nebraska. This retrocession was partially accepted by the Secretary of the Interior of the United States in October of 1970. *See* Omaha Tribe of Nebraska v. Village of Walthill, Nebraska, 460 F.2d 1327 [8th Cir. 1972]. Since then the State of Nebraska has not exercised criminal jurisdic-

tion over Indian country in Thurston County except such criminal jurisdiction as was not retroceded. Though the fact of this retrocession tends to create a distinction between the Omaha tribe and the other two tribal plaintiffs in this action, the distinction is not significant. After the retrocession the State of Nebraska continued to possess all of the civil jurisdiction conveyed to it under P.L. 280. This action, involving the state's authority to enforce its revenue laws in Indian country, involves a question affecting each of the three tribal plaintiffs equally, since it raises a question concerning the civil authority of the state under P.L. 280.

118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 [1886]; Worchester v. Georgia, 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 [1832]. That power, obviously encompasses the power to enact and enforce such laws as are in the tribe's best interest. United State v. Kagama, *supra*, 118 U.S. at 384, 6 S.Ct. 1109. That includes the power to end the federal guardianship over the tribes when, and if, that is found by Congress to be in their best interest. Board of Comm'rs v. Seber, 318 U.S. 702, 63 S.Ct. 914, 87 L.Ed. 1091 [1943]; United States v. Ramsey, 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039 [1926]. The cases strongly suggest that that power exists despite treaty provisions which purport to guarantee the integrity of the tribe and tribal lands. *See e. g.* Act of June 17, 1954, c. 303, § 1, 68 Stat. 250; Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 [1968]. Given Congress' power to end the federal guardianship in total, it obviously has the power to establish an orderly program looking to the day when the guardianship can be ended. That is precisely the type of program evidenced by the statute in this case. *See* U.S.Code Cong. & Admin. News, p. 2409 et seq. [1953]. The statute also suggests that Congress felt that the termination of the federal guardianship over the affected tribes should result in their assimilation into the mainstream of life of the states wherein they are located. P.L. 280 is a step intended to prepare the Indian tribes for this assimilation by making all state laws applicable to Indians and in Indian country except as those laws may contravene the provisions of the statute itself.

■ Congress' power to convey jurisdiction upon the states necessarily includes the power to cause Indians and Indian country to be subjected to the revenue laws of the state, the *McClanahan* case notwithstanding. The Indian state income tax immunity recognized in *McClanahan* was based upon certain ambiguous statutory and treaty provisions which were clarified when they were read against the background of the Indian sovereignty doctrine. For example, the treaty involved in the *McClanahan* case provided that certain lands would be set aside "for the use and occupation of the Navajo tribe of Indians" and "no person except those herein so authorized to do, and except such officers, soldiers, agents, and employes of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article." 15 Stat. 667, 668; McClanahan v. Arizona State Tax Comm'n, *supra*, 411 U.S. at 174, 93 S.Ct. at 1263. The Court, noting that "doubtful expressions are to be resolved in favor of the weak and defenseless people who are wards of the nation" said:

> "When this cannon of construction is taken together with the tradition of Indian independence described above, it cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos . . . was meant to establish the lands as within the exclusive sovereignty of the Navajos under general supervision. It is thus unsurprising that this Court has interpreted the Navajo treaty to preclude extension of state law—including state tax law—to Indians on the Navajo Reservation."

*Id.* 411 U.S. at 174–75, 93 S.Ct. at 1263. This rationale while applicable when the taxing authority lacks jurisdiction over Indians and Indian country is not applicable when the taxing authority has jurisdictional power over the tribe. In the cases of Superintendent of Five Civilized Tribes v. Commissioner, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 [1935]; Leahy v. State Treasurer, 297 U.S. 420, 56 S.Ct. 507, 80 L.Ed. 771 [1936]; Choteau v. Burnet, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 [1931]; the Court recognized that Indian income was taxable when, as here, the taxpayer was subject to the jurisdiction of the state or federal taxing authority, and the prop-

erty to be taxed was not excluded from taxation by treaty or statute. In the present case, the plaintiffs are subject to the limited jurisdiction of the State of Nebraska and the property to be taxed is not exempt under applicable treaty provisions or statutes.

In *McClanahan* the court also relied upon the Buck Act, 4 U.S.C.A. § 105 et seq. by noting:

> "While the Buck Act itself cannot be read as an affirmative grant of tax-exempt status to reservation Indians, it should be obvious that Congress would not have jealously protected the immunity of reservation Indians . . . had it thought that the States had residual power to impose such taxes in any event."

However, the fact that Congress exempted Indians from the provisions of the Buck Act, obviously does not detract from its power to affirmatively subject Indians to state income taxes by an appropriate grant of jurisdiction.

Finally, the Court relied upon certain provisions of the Arizona Enabling Act which prohibited the state from assuming jurisdiction over Indian Lands. This rationale is, however, equally inappropriate in light of the facts of the present case, since P.L. 280 expressly provides for the amendment of state constitutions to permit the various states to assume jurisdiction over Indian country.

Since the rationale employed in *McClanahan* seems clearly inappropriate in this case, and since Congress' power to convey jurisdiction to the states seems unquestionable, the only remaining question is whether or not the language in P.L. 280 is broad enough to cause reservation Indians to be subjected to the state's taxing authority.

■ The language and structure of P.L. 280 strongly suggest that Congress intended to convey to the states the authority to enforce its revenue laws in Indian country. The statute grants civil jurisdiction to the states over causes of actions involving Indians as parties and states that the civil laws of general application shall have the same force and effect as to Indians and within Indian country as they have throughout the state. This grant of power is then modified in later subsections to permit the federal government to retain its authority in certain areas such as over Indian trust property. One can only presume that the grant of jurisdiction in subsection [a] was to be considered plenary except as it was expressly limited by the statute. Any other interpretation of subsection [a] would require this Court to read into that section something which simply is not there. If Congress had intended to exempt Indians from the state's revenue laws, the Court feels certain that it would have expressly done so, as it exempted certain other Indian property from state jurisdiction in subsection [b] of P.L. 280, and as it expressly exempted reservation Indians from the provisions of the Buck Act. 4 U.S.C.A. § 109. By failing to quality subsection [a] Congress has expressly subjected Indians and Indian country to *all* state laws of general application including state revenue laws except where the application of those laws would violate one of the stated jurisdictional limitations in the statute.

■ The above interpretation is strongly supported by the legislative history of P.L. 280. U.S.Code Cong. & Admin.News, pp. 2409, 2412 [1953] indicates that P.L. 280 was drafted because

> "the Indians of several States have reached a stage of acculturation and development that makes desirable extension of States civil jurisdiction to the Indian country within their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable."

It was Congress' goal that this legislation be a step toward the day when the federal trusteeship over Indians could be finally ended through the assimilation of the tribes into the mainstream of life of the affected states. *Id.* at 2409; Williams v. Lee, *supra,* 358 U.S. at 220, 79 S.Ct. 269. There is no suggestion in either the legislative history of the Act, or in the language of the Act itself, that Congress intended that Indian tribes should derive the advantages of state law, while, at the same time, being shielded from its burdens.

 Plaintiffs, however, contend that subsection [b] of P.L. 280 precludes the collection of state income tax in this case. They argue that since Indian trust property cannot be alienated, encumbered, or taxed, the state lacks the power to enforce its revenue laws. Alternatively, they argue that this exception evidences a Congressional intent that subsection [a] of P.L. 280 was not intended to grant to the states the power to tax Indians. Neither argument is persuasive. First, subsection [b] applies only to real or personal property that is held *in trust* by the federal government. The income in this case is the sole property of the plaintiffs. *See* Choteau v. Burnet, *supra,* 283 U.S. at 695, 51 S.Ct. 598. Secondly, if the general trusteeship of the federal government were held to cover all property owned by Indians, then the state would not only lack the power to enforce its revenue laws, but *all* of its civil laws against Indians, since it would have no authority to enforce its judgments. This result was never contemplated by the drafters of P.L. 280. The statute clearly makes Indians proper party defendants, as well as plaintiffs, and any interpretation which would so clearly defeat the statute's logical and intended purpose should be avoided.

Accordingly, an Order will be entered overruling the plaintiffs' Motion for Summary Judgment and sustaining the defendants' Motion for Summary Judgment.