## RUSSELL BRYAN v. ITASCA COUNTY.*

228 N. W. 2d 249, 246 N. W. 2d 560.

March 28, 1975—No. 44947.

---

* Reversed, —— U. S. ——, 96 S. Ct. 2102, 48 L. ed. 2d 710 (1976).

*Gerald L. Seck,* Leech Lake Reservation Legal Services Project, and *Thomas Smithson, Daniel H. Israel,* and *John E. Echohawk,* Native American Rights Fund, for appellant.

*Warren Spannaus,* Attorney General, *Peter W. Sipkins,* Solicitor General, *Dann L. Parsons* and *Steven G. Thorne,* Special Assistant Attorneys General, and *William J. Spooner,* County Attorney, for respondent.

*Wallace H. Johnson,* Assistant Attorney General, and *Jacques B. Gelin* and *Charles E. Biblowit,* Attorneys, Department of Justice, for United States, amicus curiae, seeking reversal.

*Kent P. Tupper* and *Bernard P. Becker,* for Minnesota Chippewa Tribe, amicus curiae, seeking reversal.

YETKA, JUSTICE.

This is an appeal from a judgment of the district court, holding plaintiff, an enrolled member of the Minnesota Chippewa tribe,[1] liable for the payment of personal property taxes on his mobile home.[2] We affirm.

Plaintiff is the owner of a certain 1972 Skyline mobile home, in which he resides with his wife and family. The mobile home is located on land held in trust for the Chippewa tribe of Minne-

---

[1] The Minnesota Chippewa tribe is organized and recognized as an Indian tribe by the United States pursuant to the Act of June 18, 1934 (48 Stat. 984) as amended, under a Federal charter of incorporation issued by the then Secretary of Interior, and ratified by the tribe on November 13, 1937.

[2] The taxes challenged by plaintiff were imposed for the years 1971 and 1972 pursuant to the applicable provisions of Minn. St. 168.012, subd. 9, and § 272.01, subd. 1. Mobile homes during 1971 and 1972 were classified as 2a property. Minn. St. 273.13, subd. 3.

sota by the United States Government within the boundaries of the Greater Leech Lake Indian Reservation.

On September 12, 1972, plaintiff commenced an action in the District Court of Itasca County, seeking declaratory and injunctive relief from the tax in question on grounds the county has no authority to levy such a tax upon plaintiff and others similarly situated.

The matter was heard by the district court on March 15, 1973, which thereafter issued findings of fact and conclusions of law determining that plaintiff was not immune from the personal property tax. Plaintiff appeals from the judgment entered on December 8, 1973.

The issue raised on this appeal is whether the State of Minnesota, or its political subdivisions, may impose a personal property tax upon a mobile home owned and occupied by an enrolled member of the Chippewa tribe of Minnesota who resides within a reservation upon land held in trust by the United States government for the tribe.

As will be shown hereafter, Indians have traditionally enjoyed a unique status both under decisions of this court and those of the Federal judiciary. It has been uniformly held that no state may levy a tax upon an Indian tribal member unless authorized by Congress to do so.

In the recent case of McClanahan v. Arizona Tax Comm. 411 U. S. 164, 93 S. Ct. 1257, 36 L. ed. 2d 129 (1973), the court was confronted with an attempt by the State of Arizona to impose a state income tax upon the income of an enrolled member of the Navajo tribe who lived and derived her income from activities upon the reservation. The court held the tax imposition to be unlawful on grounds that no treaty or Federal law authorized this tax. It is relevant to note that Arizona was not included within the scope of Public Law 280, 67 Stat. 583,[3] 18 USCA, § 1162, and 28 USCA, § 1360. The court stated:

---

[3] Subsequently amended by 69 Stat. 795, 72 Stat. 545, and 84 Stat. 1358.

"\* \* \* 'State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply. It follows that Indians and Indian property on an Indian reservation are not subject to State taxation except by virtue of express authority conferred upon the State by act of Congress.' U. S. Dept. of the Interior, Federal Indian Law 845 (1958) (hereafter Federal Indian Law)." 411 U. S. 170, 93 S. Ct. 1261, 36 L. ed. 2d 135.

In Mescalero Apache Tribe v. Jones, 411 U. S. 145, 93 S. Ct. 1267, 36 L. ed. 2d 114 (1973), a companion case of McClanahan, the court was confronted with an attempt by the State of New Mexico[4] to impose a tax upon receipts of a ski resort operated by plaintiff tribe under the auspices of the Indian Reorganization Act upon land leased from the United States Forest Service. The state also imposed a compensating use tax upon the purchase price of materials used to construct ski lifts upon the leased property.

The court upheld the receipts tax upon the ground that off-reservation Indian activities are subject to more extensive state authority. The court then held such activities were subject to state law, absent express Federal law to the contrary.

However, the court held the ski-lift equipment to be exempt from state taxation because that equipment had been permanently attached to the realty and thus it was exempt in the same manner as was the land itself.

Mescalero is relevant to our inquiry as a reaffirmance of the principle that—

"\* \* \* in the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and *McClanahan v. Arizona State*

---

[4] New Mexico was not included within the scope of 67 Stat. 589, as amended, 18 USCA, § 1162, and 28 USCA, § 1360.

*Tax Comm'n, supra,* lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent." 411 U. S. 148, 93 S. Ct. 1270, 36 L. ed. 2d 119.

Therefore, the current status of the law as set forth in McClanahan and Mescalero may be summarized as follows:

(1)   The doctrine of Indian sovereignty is relevant as a backdrop in determining the applicability of state laws to reservation Indians.

(2)   Congress has plenary jurisdiction over reservation Indians. That jurisdiction may be ceded to the states only by express grants of jurisdiction. In absence of such grants, no state power exists.

Thus we must first determine whether Congress vested authority in the State of Minnesota to levy this tax upon a reservation Indian.

Defendant advances three sources of power to tax plaintiff:

(1)   The Minnesota Enabling Act.[5]

(2)   The Minnesota Constitution.[6]

(3)   Public Law 280.[7]

The Minnesota Enabling Act is silent as to any Indian lands located within the territorial boundaries of Minnesota. Defendant points out that such is not the case with the enabling acts of certain of our sister states.[8] Thus, defendant concludes that state jurisdiction, including the power to tax reservation Indians, was granted by the enabling act.

---

[5] 11 Stat. 166.

[6] Minn. Const. art. 15, § 2, which subsequent to the commencement of this action was removed by the 1974 amendment to the constitution.

[7] 67 Stat. 588, as amended, 18 USCA, § 1162, and 28 USCA, § 1360.

[8] Arizona and New Mexico, 36 Stat. 557; Montana, North Dakota, South Dakota, and Washington, 25 Stat. 676, 677; Oklahoma, 34 Stat. 267; and Utah, 28 Stat. 107. The Arizona statute is typical, providing that Indian lands in Arizona shall remain "under the absolute jurisdiction and control" of the United States. 36 Stat. 557, 569.

Defendant also contends that Article 15, § 2, of the Minnesota Constitution[9] expressly allows for taxation of Indians and was approved by Congress.

However, the above two arguments must fail in light of State v. Jackson, 218 Minn. 429, 16 N. W. 2d 752 (1944). That case involved an attempt by the state to enforce its game laws against a reservation Indian while upon the reservation. In holding such Indians immune from prosecution under state game laws, this court stated:

"* * * But it is as uniformly held that, absent a treaty or federal statute conferring it, a state's jurisdiction does not extend over the individual members of an Indian tribe maintaining their tribal relations and organization upon a reservation within the geographical limits of the state. Such tribes are domestic, dependent communities under the guardianship, protection, and exclusive jurisdiction of the federal government, with the power of regulating their own internal and social relations, except as otherwise directed by congress. * * *

"The admission of a state into the Union, even without an express reservation by congress of governmental jurisdiction over the public lands within its borders, does not qualify the former federal jurisdiction over tribal Indians so as to withdraw from the United States authority to punish crimes committed by or against Indians on an Indian reservation (Donnelly v. United States, supra), or so as to make tribal Indians amenable to state laws for crimes committed on their reservation. United States v. Kagama, supra; 27 Am. Jur., Indians, § 47. Whatever rights a state acquires by its Enabling Act are subordinate to the Indians' prior right of occupancy. United States v. Thomas, 151 U. S. 577, 583, 14 S. Ct. 426, 428, 38 L. ed. 276, 278; Tulee v.

---

[9] Minn. Const. art. 15, § 2, prior to its removal in 1974, stated:

"§ 2. Residents on Indian lands

"Sec. 2. Persons residing on Indian lands within the State shall enjoy all rights and privileges of citizens, as though they lived in any other portion of the State, and shall be subject to taxation."

Washington, 315 U. S. 681, 62 S. Ct. 862, 86 L. ed. 1115; State v. Cooney, 77 Minn. 518, 80 N. W. 696." 218 Minn. 431, 16 N. W. 2d 754.

The language of Public Law 280 lends support to defendant's assertion of power to levy the tax at issue. Specifically, 28 USCA, § 1360, provides as follows:

"(a)   Each of the States or Territories listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, *and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory:*

"State or

| Territory of | Indian country affected |
|---|---|
| Alaska | All Indian country within the Territory. |
| California | All Indian country within the State. |
| Minnesota | All Indian country within the State, except the Red Lake Reservation. |
| Nebraska | All Indian country within the State. |
| Oregon | All Indian country within the State, except the Warm Springs Reservation. |
| Wisconsin | All Indian country within the State. |

"(b)   Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant

thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c)   Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section." (Italics supplied.)

Defendant logically argues that unless paragraph (a) is interpreted as a general grant of the power to tax, then the exceptions contained in paragraph (b) are limitations on a nonexistent power.

Plaintiff contends that Public Law 280 was intended as a "law and order" statute not intended to grant such sweeping powers to state and local governments.

A review of the legislative history of the act discloses that this provision was enacted in furtherance of the congressional policy of "termination" as expressed in H. R. Con. Res. 108, 83rd Cong. 1st Sess., 67 Stat. B 132, which states:

"* * * [I]t is the policy of Congress, as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship; and

"* * * the Indians within the Territorial limits of the United States should assume their full responsibilities as American citizens."

At oral argument, one of the attorneys representing the United States Department of Interior advised this court that the government's policy of assimilation was no longer working, and the department now supports plaintiff's position. However, this court

is bound to interpret the statutes according to the intent of Congress *at the time of passage* of Public Law 280. If Congress today intends a different result, it can easily repeal or modify Public Law 280. However, we accept the logic of defendant's position that it would make little sense for Congress to grant full civil and criminal powers to the state over all Indian territory and all Indian tribes in Minnesota (except the Red Lake Band) and specifically exempt certain property from taxation if the power to tax were not included within the original civil powers granted. See, Note, 39 Minn. L. Rev. 853.

The case most directly in point is a recent decision reached in the Federal District Court for the District of Nebraska in Omaha Tribe of Indians v. Peters, 382 F. Supp. 421 (D. Neb. 1974). That court held that Public Law 280 granted the State of Nebraska the power to levy a state income tax upon the income derived by an Indian from employment on the reservation. The following excerpts from the court's opinion are relevant:

"* * * [I]t should be noted that P. L. 280 does not subject Indians to the jurisdiction of the state *by implication*. The statute is a clear and express grant of power subject only to the limitations stated in the ensuing sections of the statute. * * *

* * * * *

"* * * given Congress' power to end the federal guardianship in total, it obviously has the power to establish an orderly program looking to the day when the guardianship can be ended. That is precisely the type of program evidenced by the statute in this case. *See* U. S. Code Cong. & Admin. News, p. 2409 et seq. [1953]. The statute also suggests that Congress felt that the termination of the federal guardianship over the affected tribes should result in their assimilation into the mainstream of life of the states wherein they are located. P. L. 280 is a step intended to prepare the Indian tribes for this assimilation by making all state laws applicable to Indians and in Indian country except as those laws may contravene the provisions of the statute itself.

* * * * *

"The language and structure of P. L. 280 strongly suggest that Congress intended to convey to the states the authority to enforce its revenue laws in Indian country. *The statute grants civil jurisdiction to the states over causes of actions involving Indians as parties and states that the civil laws of general application shall have the same force and effect as to Indians and within Indian country as they have throughout the state. This grant of power is then modified in later subsections to permit the federal government to retain its authority in certain areas such as over Indian trust property.* One can only presume that the grant of jurisdiction in subsection [a] was to be considered plenary except as it was expressly limited by the statute. Any other interpretation of subsection [a] would require this Court to read into that section something which simply is not there. If Congress had intended to exempt Indians from the state's revenue laws, the Court feels certain that it would have expressly done so, as it exempted certain other Indian property from state jurisdiction in subsection [b] of P. L. 280, and as it expressly exempted reservation Indians from the provisions of the Buck Act. 4 U. S. C. A. § 109. By failing to quality [sic] subsection [a] Congress has expressly subjected Indians and Indian country to *all* state laws of general application including state revenue laws except where the application of those laws would violate one of the stated jurisdictional limitations in the statute.

"The above interpretation is strongly supported by the legislative history of P. L. 280. U. S. Code Cong. & Admin. News, pp. 2409, 2412 [1953] indicates that P. L. 280 was drafted because 'the Indians of several States have reached a stage of acculturation and development that makes desirable extension of States civil jurisdiction to the Indian country within their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable.'

It was Congress' goal that this legislation be a step toward the day when the federal trusteeship over Indians could be finally ended through the assimilation of the tribes into the mainstream of life of the affected states. *Id.* at 2409; Williams v. Lee, *supra,* 358 U. S. at 220, 79 S. Ct. 269. There is no suggestion in either the legislative history of the Act, or in the language of the Act itself, that Congress intended that Indian tribes should derive the advantages of state law, while, at the same time, being shielded from its burdens." (Italics supplied in part.) 382 F. Supp. 424.

The Peters case appears to be the only case relevant to the instant inquiry. Defendant relies upon Agua Caliente Band of Mission Indians v. County of Riverside, 442 F. 2d 1184 (9 Cir. 1971), certiorari denied, 405 U. S. 933, 92 S. Ct. 930, 30 L. ed. 2d 809 (1972). However, as plaintiff points out in his reply brief, that case dealt with an attempt to impose a leasehold tax upon a non-Indian. Commissioner of Taxation v. Brun, 286 Minn. 43, 174 N. W. 2d 120 (1970), is also not relevant here. That case dealt with the Red Lake Band of Chippewa Indians, which occupies a distinct position and is not subject to Public Law 280. The recent case of Tonasket v. State, 84 Wash. 2d 164, 525 P. 2d 744 (1974), which reconsidered Tonasket v. State, 79 Wash. 2d 607, 488 P. 2d 281 (1971), upon remand from the United States Supreme Court, 411 U. S. 451, 93 S. Ct. 1941, 36 L. ed. 2d 385 (1973), is not particularly helpful since it actually dealt only with the narrow issue of the power of a state, following its assumption of jurisdiction over Indian tribes pursuant to Public Law 280, to impose a tax upon the sale of cigarettes within the reservation boundaries by an Indian seller to nonreservation customers.

Plaintiff's strongest argument lies in the application of rules of construction, the most prominent of which was repeated in McClanahan as follows:

"The Indian sovereignty doctrine is relevant, then, not because it provides a definitive resolution of the issues in this suit, but

because it provides a backdrop against which the applicable treaties and federal statutes must be read." [10] 411 U. S. 172, 93 S. Ct. 1262, 36 L. ed. 2d 136.

Plaintiff cites the absence of any specific grant of taxing power in Public Law 280 and thus characterizes the granting of such a power as doubtful. [11] Of course, herein lies the crux of the entire case. Defendant's position, and the opinion of the court in Peters is that Public Law 280 is a clear grant of the power to tax, and we so hold.

Although it is conceded that Indians have had a unique legal status in our society since earliest times, the various Indian tribes are not sovereign states. They only have such powers as Congress allows them to retain.

It has been the Federal government, through its vacillation in determining the best course to follow for over 100 years, that has led to the present confusion, including the issues raised by this lawsuit. The government first appears to move toward termination and assimilation, then to retreat from those objectives, and retrenches, this indecision has resulted in a great deal of confusion. However, insofar as Public Law 280 is concerned, we think the Federal District Court which decided the Peters case was correct when it stated:

"The language and structure of P. L. 280 strongly suggest that Congress intended to convey to the states the authority to enforce its revenue laws in Indian country. * * * One can only presume that the grant of jurisdiction in subsection [a] was to be

---

[10] See, also, Squire v. Capoeman, 351 U. S. 1, 76 S. Ct. 611, 100 L. ed. 883 (1956); Choate v. Trapp, 224 U. S. 665, 32 S. Ct. 565, 59 L. ed. 941 (1912).

[11] In Omaha Tribe of Indians v. Peters, 382 F. Supp. 421, 425 (1974), the court stated that the rule of construction as set forth in McClanahan does not apply "when the taxing authority has jurisdictional power over the tribe." This statement presupposes resolution of the crucial question—whether jurisdiction in fact exists. Thus, the McClanahan rule of construction is applicable if in fact P. L. 280 contains a doubtful expression.

considered plenary except as it was expressly limited by the statute." 382 F. Supp. 426.

It appears to us that Congress must decide whether to continue the program of assimilation which was outlined in the Hoover Commission Report of 1949, and embodied in Public Law 280 or to return greater sovereign immunity to the various Indian tribes, including the return to them of full civil and criminal jurisdiction free from all state control, and the freeing of the states from some liability for the care, support, and administration of the various Indian tribes. To choose the latter alternative without freeing the states of their responsibilities would appear to raise a serious question of violation of the equal protection clauses of both the United States Constitution and the Constitution of the State of Minnesota.

Plaintiff has, for the first time, alleged in his brief that his mobile home was in fact annexed to tribal trust land, and thus is exempt under Public Law 280. However, in his complaint plaintiff does not allege that the mobile home is real property. In fact, paragraph 9 of his complaint states the defendant has no lawful authority "to assess or impose a tax upon his *personal property*." (Italics supplied.) This entire lawsuit and appeal were predicated on the assumption that this mobile home was in fact personal property. The trial court in its findings stated:

"That there is no claim that the 1972 Skyline mobile home is any part of the real estate, but is personal property."

Therefore, we do not rule as to whether the mobile home can be taxed if in fact it is permanently affixed to the realty and cannot be removed by the owner, and thus is assessable in the manner of real estate taxes. This court has repeatedly refused to decide issues first raised on appeal. Rathbun v. W. T. Grant Co. 300 Minn. 223, 219 N. W. 2d 641 (1974); Tourville v. Tourville, 292 Minn. 489, 198 N. W. 2d 138 (1972).

In summary, the question raised is whether Public Law 280 provides authority for defendant to levy the tax at issue. The lan-

guage of the act, case law, and logic lend support to defendant's position. The trial court therefore must be and hereby is affirmed.

MR. JUSTICE KELLY and MR. JUSTICE KNUTSON took no part in the consideration or decision of this case.

On August 13, 1976, the following opinion was filed:

On remand from United States Supreme Court.

PER CURIAM.

Pursuant to the mandate of the United States Supreme Court dated June 15, 1976, filed herein on July 20, 1976, reversing the judgment of this court with costs, the judgment of this court affirming the trial court's judgment is hereby vacated and set aside, and the judgment of the trial court is hereby reversed.

Reversed.