**DULUTH LUMBER AND PLYWOOD COMPANY, Respondent,**

v.

**DELTA DEVELOPMENT, INC., Defendant.**

**Appeal of FOND DU LAC HOUSING AUTHORITY.**

No. 48746.

Supreme Court of Minnesota.

June 22, 1979.

Rehearing Denied Aug. 10, 1979.

---

5. L.1977, c. 439, § 116C.57, subd. 4(8); Power Plant Siting Act, P.L. 95–599, § 113, 92 Stat. 2696.

Tupper, Smith & Seck, Peter W. Cannon and Kimball D. Mattson, Walker, for appellant.

Courtney, Gruesen & Petersen and Thomas W. Gruesen, Duluth, for respondent.

Heard before KELLY, TODD, and YETKA, JJ., and considered and decided by the court en banc.

TODD, Justice.

Duluth Lumber and Plywood Company (Duluth Lumber) furnished materials to Delta Development, Inc. (Delta), which was the general contractor on a turnkey housing project being constructed on the Fond du Lac Indian Reservation. Final payment on the housing project was made to Delta without properly following procedures designed · to protect suppliers and laborers. After Delta failed to pay Duluth Lumber, an action was commenced by Duluth Lumber against Delta and the Indian Housing Authority. The Housing Authority, established by the Reservation Business Committee, had waived its sovereign immunity under an ordinance enacted by the council. The trial court awarded judgment to Duluth Lumber against Delta and the Housing Authority. We affirm.

In 1964, the Housing Authority was created by the Fond du Lac Reservation Business Committee as a separate corporate entity to develop housing on the Fond du Lac Indian Reservation. The Business Committee is the governing body of the Fond du Lac Chippewa Indians.

Pursuant to the creation of the Housing Authority, the Business Committee enacted a housing ordinance which states:

> "The Council hereby gives its irrevocable consent to allowing the Authority to sue and be sued in its corporate name, upon any contract, claim or obligation arising out of its activities under this

ordinance, and hereby authorizes the Authority to agree by contract to waive its immunity from suits which it otherwise might have." Reservation Housing Ordinance 63–1, Article V2.a.

The bylaws of the Housing Authority set forth many of its rights, obligations, and procedures. Under art. II, § 5, a board of commissioners directs the disbursement of funds. To assist in these functions, the Housing Authority has a treasurer.

In September 1971, the Housing Authority entered into an agreement with the United States Department of Housing and Urban Development (HUD) for the purpose of enabling the construction of certain houses on the Fond du Lac Indian Reservation. Pursuant to this agreement, the Housing Authority entered into a construction and development contract with Delta. Under this contract, Delta agreed to construct the houses on a "turnkey" basis whereby the housing is finished and prepared for occupancy so that Delta need only turn the keys over to the Housing Authority. No bond was required of Delta, and no supplier could obtain any lien rights because Indian land was involved. Delta purchased some materials for the housing from Duluth Lumber, and by 1972 much of the construction was completed.

The disbursement of monies for payment of the housing was governed largely by the annual contributions contract, an agreement made between the Housing Authority and HUD. Under this contract, periodic payments were made as the work progressed. The director of the Housing Authority, Mrs. Christine Bellecourt, signed several checks on behalf of the Authority and payments of over $500,000 were made as the work progressed. However, Mrs. Bellecourt testified that she knew little or nothing about the project, that it was discussed very little, and that the Housing Authority had conducted only two full meetings during most of the construction period.

The construction of the housing drew near a close in 1973. Section 123 of the annual contributions contract provided in part:

" * * * In making periodic partial payments, the local Authority shall retain at least 10% of the amount of each periodic estimate until final completion and acceptance of all work covered by the particular contract; provided that after one-half of the work has been completed and if the work is progressing satisfactorily and continues to so progress, the local Authority may make the remaining partial payments in full for the work subsequently performed.

"(b) Each construction or equipment contract shall provide that final payment to the contractor by the local Authority of amounts retained under Subdivision (a) of this Section 123 shall not be made (1) until a contractor has furnished a release, in a form approved by the Government, of all claims against the local Authority arising under and by virtue of such construction or equipment contract, other than such claims, if any, (the basis, scope and amount of each of which are clearly defined and stated) as may be specifically accepted by the contractor from the operation of such release, and (2) the contractor has furnished evidence satisfactory to the local Authority that the contractor has paid, and that his subcontractors have paid, all sums due to laborers, mechanics and materialmen, (3) with the prior approval of the Government, the local Authority may release to the contractor a portion of the amounts retained under Subsection (a) of this Section 123 in advance of making final payment, but shall not make final payment to any contractor until the Government has approved the certificate of completion described in Subsection (c) of Section 124."

This clause in the contract is designed to assure completion of the project and payment of all laborers or materialmen at a closing when the final payment was made.

A formal closing, which is customary in such projects, was never held. With a check dated September 24, 1973, and signed by Mrs. Bellecourt, the Housing Authority in violation of the above-quoted clause made a final payment in full to Delta in the

amount of $169,234.14. No lien waivers or other evidence that Duluth Lumber had been fully paid were obtained from Duluth Lumber at that time, and apparently no certificate of completion was approved. Delta thereafter solicited a lien waiver from Duluth Lumber for the purpose of justifying Delta's final payment to Duluth Lumber. Delta had already paid Duluth Lumber almost $120,000 for materials, but Delta still owed a final payment of over $20,000 to Duluth Lumber.

Use of the lien waiver was Duluth Lumber's customary means of obtaining payment from Delta, even though no lien against the property actually existed. The lien waiver was dated October 19, 1973, several weeks after final payment had been made by the Authority to Delta. It was issued by Duluth Lumber without knowledge that final payment had already been made by the Housing Authority to Delta. After receiving the lien waiver, Delta issued a check to Duluth Lumber. Upon presentation to the bank, the check was dishonored because of insufficient funds. A second presentation was also fruitless, and Delta has disappeared from the state.

Duluth Lumber has brought an action against Delta and the Housing Authority. Default judgment was entered against Delta. The action against the Housing Authority was based on breach of its duty to comply with the procedural safeguards that would have assured final payment to Duluth Lumber. Judgment was entered for Duluth Lumber, and the Housing Authority appeals.

The issues presented on this appeal are:

(1) Is the Housing Authority immune from suit in the Minnesota state courts?

    (a) Do the state courts have jurisdiction over this civil suit between an Indian Housing Authority and a private corporation?

    (b) Is the sovereign immunity of the Indian Housing Authority waived by a "sue and be sued" clause?

(2) May a supplier of materials base a claim against the Housing Authority for failure to comply with procedural safe-guards in the annual contributions contract which assure that the contractor pay the supplier?

### 1. *Immunity of the Indian Housing Authority*

#### a. *Jurisdiction of the State Courts*

■ The Housing Authority suggests that, aside from its sovereign immunity, the state courts have no jurisdiction over this dispute because it involves a matter which is appropriate for resolution only by a Chippewa tribunal. Under the facts of this case, we hold that the Minnesota state courts do have jurisdiction.

The question of state jurisdiction over matters involving Indians is complex and not susceptible to easy resolution. Court decisions are not always consistent, and the maze of judicial considerations has been the discussion of numerous commentaries. See, Goldberg, *Public Law 280: The Limits of State Jurisdiction Over Reservation Indians,* 22 UCLA L.Rev. 535; Note, 25 Hastings L.J. 1451; Comment, 4 Wm.Mitchell L.Rev. 454.

Much of the problem in assessing the appropriate limits of jurisdiction stems from the vacillating views of Congress and the Federal Government concerning Indian reservations. Prior to 1953, state courts had little authority to adjudicate disputes concerning Indian matters. In 1953, Congress enacted Public Law 280 (codified at 18 U.S.C. § 1162, 28 U.S.C. § 1360), which granted jurisdiction to many states over certain civil and criminal matters. As one commentator observes:

"* * * Public Law 280 [granted] to Minnesota, among other states, jurisdiction over many civil and criminal actions on most reservations within the state. Jurisdiction over certain items on all Minnesota reservations, however, was reserved by the federal government to the tribal groups. The items which were reserved from the jurisdiction granted to Minnesota are items that generally were the subject of treaties and that are tied to the particular location in which they

occur, such as hunting, fishing, trapping, taxation, and other civil regulatory functions. Administration of tribal rights relating to such matters is accomplished through statutes and ordinances passed by the tribal government of each reservation." 4 Wm.Mitchell L.Rev. 456. (Footnotes omitted.)[1]

See, also, *Washington v. Confederated Bans and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (discussing Public Law 280). The purpose of the statute was to curtail the problem of lawlessness on many reservations which had developed due to inadequate Indian institutions for law enforcement.

Public Law 280 was enacted at a time when Congress favored assimilation of the Indian culture with American culture, and would seem to give state jurisdiction over all matters that are not expressly reserved to the Indians. In recent years, however, it is clear that Federal courts have recognized a Federal policy of Indian self-government rather than assimilation, and therefore judicially-created restrictions on state jurisdiction have been imposed. Defining the precise nature of these restrictions is the task which confronts this court.

Several United States Supreme Court decisions are instructive on the limitations of state jurisdiction over Indian matters. One of these decisions is *Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), reversing 303 Minn. 395, 228 N.W.2d 249 (1975). In that case, the United States Supreme Court held that the state does not have authority to impose a personal property tax on a mobile home located on the Leech Lake Indian Reservation in Minnesota. In discussing the meaning of Public Law 280, § 4, the court said (426 U.S. 383, 96 S.Ct. 2108, 48 L.Ed.2d 718):

> "Piecing together as best we can the sparse legislative history of § 4, subsection (a) seems to have been primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes * * *."

Thus, state courts generally have full jurisdiction over common-law disputes such as torts or contracts involving Indians. However, additional language in the court's opinion indicates that even this jurisdiction may be limited in certain situations (426 U.S. 387, 96 S.Ct. 2110, 48 L.Ed.2d 720):

> " * * * Today's congressional policy toward reservation Indians may less clearly than in 1953 favor their assimilation, but Pub.L. 280 was plainly not meant to effect total assimilation. * * * And nothing in its legislative history remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than ' "private, voluntary organizations" ' * * *."

Therein lies an ever-present, overriding principle: State jurisdiction must not interfere with Indian self-government, absent some compelling state interest.[2]

A subsequent Supreme Court decision has underscored this principle limiting state jurisdiction. In *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the court held that only tribal

---

1. 28 U.S.C., § 1360(b), denies states the power to alienate, encumber, or tax real or personal property of Indians or tribes held in trust by the Federal Government or interfere with Indian property in manners inconsistent with Federal treaties, agreements, or statutes, such as by depriving Indians of their rights under Federal treaties, agreements, or statutes with regard to hunting, fishing, or trapping.

    State jurisdiction over the Red Lake Band in Minnesota is even more limited because Con-

gress expressly excepted the Band from Public Law 280. See, *In re Settlement of Beaulieu,* 264 Minn. 406, 119 N.W.2d 25 (1963). The Fond du Lac Reservation is not a part of the Red Lake Band.

2. This principle was recognized by this court in *Red Lake Band of Chippewa Indians v. State,* 311 Minn. 241, 248 N.W.2d 722 (1976), noted in 4 Wm.Mitchell L.Rev. 454.

institutions have jurisdiction under the Indian Civil Rights Act of 1968 to settle an intratribal dispute. In resolving the question of jurisdiction, the court said (436 U.S. 59, 98 S.Ct. 1677, 56 L.Ed.2d 116):

"* * * Even in matters involving commercial and domestic relations, we have recognized that 'subject[ing] a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves,' * * * may 'undermine the authority of the tribal cour[t] * * * and hence * * * infringe on the right of the Indians to govern themselves.' * * A fortiori, resolution in a foreign forum of intratribal disputes of a more 'public' character, such as the one in this case, cannot help but unsettle a tribal government's ability to maintain authority. Although Congress clearly has power to authorize civil actions * * * a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."

See, also, *McClanahan v. Arizona Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).[3]

The question in the present case, therefore, is whether the state court would adversely affect the Chippewa Tribe's self-government by assuming jurisdiction over a civil dispute involving monies disbursed by the Housing Authority.

Generally, state courts may assume jurisdiction over disputes arising from commercial transactions between Indians and non-Indians if the transaction is not confined to the Indian Reservation. *Crawford v. Roy,* Mont., 577 P.2d 392 (1978); *Indian Oasis School Dist. No. 40 v. Zambrano,* 22 Ariz.

App. 201, 526 P.2d 408 (1974). In *Little Horn State Bank v. Stops,* 170 Mont. 510, 555 P.2d 211 (1976), certiorari denied, 431 U.S. 924, 97 S.Ct. 2198, 53 L.Ed.2d 238 (1977), a bank sought to levy upon certain property owned by private Indians, who had borrowed money from the bank. The bank was located and the transaction occurred outside of the reservation. The Montana Supreme Court held that the state court had jurisdiction. In so holding, the court said (170 Mont. 515–516, 555 P.2d 214):

"The crucial fact of this appeal is that the subject matter jurisdiction lies with the state court, not the tribal court. In this case the tribal members elected to leave the reservation and conduct their affairs within the jurisdiction of the state courts. When they do so they are submitting themselves to the laws of this state. They cannot violate those laws and then retreat to the sanctuary of the reservation for protection."

Cases which indicate that a state has no jurisdiction over commercial disputes involving Indians and non-Indians can be distinguished. In *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the Supreme Court held that a non-Indian owner of a store on a Navajo Indian reservation could not invoke state court jurisdiction to collect a debt owed by a Navajo Indian, but instead must seek relief through tribal institutions. This case can be distinguished because the transaction occurred entirely on the reservation and the state had not acquired jurisdiction under Public Law 280. Other cases involving torts or transactions entirely on the reservation can be distinguished on the same basis. See *Sigana v. Bailey,* 282 Minn. 367, 164 N.W.2d 886 (1969) (tribe excepted from Public Law 280); *Security State Bank v. Pierre,* 161 Mont. 350, 511 P.2d 325 (1973) (business transaction entirely reservation).

---

**3.** In *McClanahan,* 411 U.S. 164, 179, 93 S.Ct. 1257, 1266, 36 L.Ed.2d 129, 140, the Supreme Court said: "* * * In these situations [involving conflicts between Indians and non-Indians], both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The Williams test was designed to resolve this conflict by providing that the State could protect its interest up to the point

where tribal self-government would be affected.

\* \* \* \* \* \*

"* * * This Court has therefore held that 'the question has always been whether the state action infringed on the right of *reservation Indians* to make their own laws and be ruled by them.'"

In conclusion, state jurisdiction in this case does not interfere with the right of the Indians on the Fond du Lac Reservation to make their own laws and be ruled by them. By entering into an agreement with the United States and Delta, a private developer, the Housing Authority is deemed to have submitted itself to the jurisdiction of non-Indian institutions for the purpose of construing and enforcing the agreement. Construction and application of the agreement are at stake, not the governmental functions, laws, or customs of the tribe. Hence, state jurisdiction is proper.

### b. Sovereign Immunity

■ A question separate from state jurisdiction is whether the Housing Authority has sovereign immunity; that is, even if the state has jurisdiction, the tribe might be immune from suit.

There is no question that Indian tribes are generally immune from suit. They have traditionally enjoyed immunity, and recent decisions of the United States Supreme Court have reaffirmed their immunity. *Santa Clara Pueblo v. Martinez, supra; Puyallup Tribe v. Washington Game Dept.,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). See, generally, Werhan, *The Sovereignty of Indian Tribes: A Reaffirmation and Strengthening in the 1970's,* 54 Notre Dame Law. 5.

There is a question, however, of whether this immunity was waived. This alleged waiver is based on the "sue and be sued" clause contained in the housing ordinance adopted by the governing body of the Fond du Lac Reservation. The Housing Authority relies on *Hickey v. Crow Creek Housing Authority,* 379 F.Supp. 1002 (C.D.S.D.1974), for the proposition that the "sue and be sued" clause is not a waiver of immunity in state courts. In that case, the plaintiff alleged that an Indian Housing Authority had wrongfully prevented him from drilling artesian wells for the Housing Authority. The Federal court held that a "sue and be sued" clause in the ordinance creating the Housing Authority made the Authority amenable to suit, but only in a Navajo tribal court. This case can be distinguished, however. The tribal ordinance gave the *tribal court* "original jurisdiction over Indians in all matters of a civil nature." Unlike the facts in *Hickey v. Crow Creek Housing Authority, supra,* the Fond du Lac Reservation does not even have a tribal court, and no language in the "sue and be sued" ordinance limits jurisdiction to a tribal court.

A much more persuasive case is *Namekagon Development Co. v. Bois Forte Reservation Housing Authority,* 395 F.Supp. 23 (D.Minn.1974). In that case, a contractor brought an action against an Indian Housing Authority for breach of contract wherein the contractor had agreed with the Authority to construct turnkey housing projects. Rejecting the *Hickey* decision, the Federal District Court held that the sovereign immunity had been waived under a "sue and be sued" provision, which is virtually identical to that in this case. The ordinance had been adopted by the Reservation Business Committee, as in this case. The court spoke of factors which compelled this holding (395 F.Supp. 28):

" * * * It is important to the development of the Indian tribes that they be given a greater control over their own destinies. If they are to be permitted to form corporations to conduct semi-governmental activities, they must of necessity be permitted to waive immunity from suit with respect to those activities. * * *

\* \* \* \* \* \*

"To dismiss this suit against the local Housing Authority on grounds of sovereign immunity would be grossly unfair. The Reservation Business Committee purported to create an independent corporation which would be legally responsible for its promises. It invited outsiders to do business with it on a contractual basis, and the corporation promised the plaintiff over one million dollars in compensation. As was said by another Court in a related context:

" ' * * * [I]t is repugnant to the American theory of sovereignty that an instrumentality of the sovereign shall

have all the rights and advantages of a trading corporation, and the ability to sue, and yet be itself immune from suit, and able to contract with others, or to injure others, confident that no redress may be had against it as a matter of right * * *."

The Eighth Circuit affirmed the Federal district court's decision. 517 F.2d 508 (8 Cir. 1975).

Other courts have also indicated recently that a corporation created by an Indian Tribe has no immunity if the governing body of the tribe has adopted a "sue and be sued" clause. See, *Parker Drilling Co. v. Metlakatla Indian Community,* 451 F.Supp. 1127 (D.Alaska 1978); *Atkinson v. Haldane,* 569 P.2d 151, 175 (Alaska 1977) (by implication) (clause has effect of waiving immunity if suit is against a corporate entity distinct from the governing body of the tribe.) See, also, *Puyallup Tribe v. Washington Game Dept. supra* (Congress or tribe may waive immunity); *Martinez v. Southern Ute Tribe,* 150 Colo. 504, 374 P.2d 691 (1962).

Although this court has left open questions as to the precise meaning of a "sue and be sued" clause,[4] we conclude that the Housing Authority has no sovereign immunity from suit in state court because the Reservation Business Committee—the governing body of the tribe—has purposely waived it by enacting an ordinance that expressly provides for suits by and against the Housing Authority.

## 2. *The Merits of the Claim*

■ Unlike the jurisdictional issues in this case, the issues concerning the merits are relatively simple. Duluth Lumber seeks to recover against the Housing Authority on the theory that the Housing Authority had a duty to make sure that no final payment was made to Delta until the materialmen were paid. It has no mechanics lien because the project is located on land owned by the United States and the Indians.

This court has consistently held that an owner is not liable for work or materials furnished a contractor when he is not a party to the contract between the contractor and the materialman. *Johnson & Peterson, Inc. v. Toohey,* 285 Minn. 181, 172 N.W.2d 326 (1968), second appeal dismissed, 289 Minn. 362, 184 N.W.2d 586 (1971); *Lundstrom Construction Co. v. Dygert,* 254 Minn. 224, 94 N.W.2d 527 (1959). Thus, Duluth Lumber must show some exceptional basis upon which to impose liability upon the Housing Authority.

In its complaint, Duluth Lumber alleged that it was an intended beneficiary of the provisions in Section 123 of the annual contributions contract which required as a condition to the Housing Authority's final payment to Delta that documentation be presented showing that materialmen and laborers had been paid. There is merit to the allegation that Duluth Lumber was an intended beneficiary of the promise by the Housing Authority to not make the final payment until such documentation was received.

In discussing the provisions of bonds and construction contracts which require payment to materialmen, Williston, Contracts, § 372, p. 916 (3d ed. Jaeger), states the general rule:

"It is a common stipulation in a building contract that the contractor will pay all bills for labor and materials. In most cases the fulfillment of this promise by the contractor operates to protect the owner of the building, whose building would be liable to satisfy the liens given by the law to workmen and materialmen, though he himself would not be personally liable.

"It is not easy to infer that the promisee requires the promise in order to benefit such creditors of the contractor. The natural inference is that his object is to protect himself or his building. This inference has caused a number of courts to deny recovery to laborers and materialmen in an action on a contractor's surety

4. See, *Miller v. Chou,* 257 N.W.2d 277 (Minn. 1977).

bond given to the owner of a private building.

\* \* \* \* \* \*

" \* \* \* [W]here the owner of the building is a municipality, school district, county, or state there can be no inference that the owner desired the promise for his own benefit, since the laws give no liens against the buildings of such owners. In such cases if the stipulation can be regarded as the result of more than the accidental insertion of a provision common in building contracts without reflection as to its necessity, it must be supposed that the object was to benefit creditors of the contractor."

This court has recognized similar principles. In *Hedberg & Sons Co. v. Galvin*, 274 Minn. 422, 144 N.W.2d 263 (1966), this court held that a materialman is an incidental rather than an intended beneficiary of a bond provision benefiting the owner. The court drew a distinction, however, between public owners and private owners with respect to the effect of such provisions (274 Minn. 425, 144 N.W.2d 265):

"The fact that the surety bond is intended to protect only the person for whom the work is done does not strip of any meaning the indemnification from 'failure to pay for labor and material.' If the licensee contractor fails to pay his laborers or materialmen and they impose a mechanics lien on the owner's property, the owner will then be able to fall back on the surety bond for protection. It is up to the laborers or materialmen, however, to invoke the mechanics lien statute for their protection."

The court continued in a footnote (274 Minn. 426, 144 N.W.2d 265, n. 3):

"Statutes do often require performance bonds of contractors performing contracts for public buildings or improvements. \* \* \* One of the reasons for extending protection in these cases to laborers and materialmen is brought out in 43 Am.Jur., Public Works and Contracts, § 145: ' \* \* \* Without such bond laborers and materialmen may suffer much injustice and loss by reason of the failure of irresponsible contractors to pay for the labor and material used in making public improvements, in view of the fact that such laborers and materialmen ordinarily have no right to a mechanics lien upon public property."

This discussion indicates that if construction work is performed on public property that is exempt from a mechanics lien, then promises in the contract concerning payment of materialmen will be deemed to be for the benefit of the materialmen because the public owner does not need protection against a mechanics lien and because of the injustice which would otherwise be suffered by the materialmen who have no lien rights. Such reasoning supports recovery under the particular facts of this case. The materialman, Duluth Lumber, has no mechanics lien because it does not attach to the property of the United States or the Indian Housing Authority. Thus, neither the United States nor the Housing Authority needs protection against a mechanics lien, and the contractual provision inserted by HUD requiring that the materialmen be paid before the Housing Authority makes final payment to the contractor can reasonably be interpreted as to benefit the materialmen. We find support for our conclusion in cases presenting a somewhat analogous fact situation.[5]

The trial court in ordering judgment for Duluth Lumber did not include a memorandum indicating upon what theory of recovery it was ordering judgment. Duluth

5. See, *Avco Delta Corp. v. Canada Ltd.*, 484 F.2d 692 (7 Cir. 1973), certiorari denied, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974), second appeal, 540 F.2d 258 (7 Cir. 1976); *Framingham Trust Co. v. Gould-National Batteries, Inc.*, 427 F.2d 856 (1 Cir. 1970). Cases wherein the materialmen were not found to be intended beneficiaries of retainage provisions generally may be distinguished on the basis that a mechanics lien was available to the materialmen and on the basis of particular facts or contractual provisions negating the argument that the materialmen were intended beneficiaries. See, *Corpus Christi Bank and Trust v. Smith*, 525 S.W.2d 501 (Tex.1975); *Holiday Development Co., Inc. v. J. A. Tobin Const. Co.*, 219 Kan. 701, 549 P.2d 1376 (1976).

Lumber, in its complaint, alleged several theories of recovery, including third-party beneficiary. An examination of the record and the findings of fact of the trial court establishes that the evidence supports the judgment on the theory of third-party beneficiary in accordance with the principles set forth above.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.